**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:21-cr-35-RC-2** |
| | ) | |
| **PETER STAGER,** | ) | |
| *Defendant.* | ) | |
| | ) | |

---

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### I.    INTRODUCTION

Peter Francis Stager, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Stager comes before this Court humbled, contrite, and extraordinarily remorseful for his actions which have brought him before it following his acceptance of responsibility upon entering a plea of guilty to one (1) count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(l) and (b), 2.

Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, his unlikelihood of recidivism, the need to avoid unwarranted sentencing disparities, and other mitigating circumstances, Mr. Stager respectfully requests that the Court impose a sentence of time served, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing.18 U.S.C. § 3553(a).

### II.    MR. STAGER'S BACKGROUND

#### A.    Family History

One could say that Mr. Stager has lived many lives. Forty-four (44) years ago, in San Jose, California, Peter Francis Stager was born as Pedro Lopez, to Tilly Lopez, █████████

████; he never knew his biological father. *See* PSR at ¶ 74. Mr. Stager has at least five (5)

biological siblings, ██████████████████████████████. *See id*. Mr. Stager, his mother, and

his siblings spent the first years of their life homeless; they slept under benches and slides in a park

in California. *See id*. at ¶ 75. While most of their meals came from dumpsters and charitable

strangers, Mr. Stager's mother taught Mr. Stager and his siblings to steal from stores and ████

██████████████████████████████████ *Id*. Ultimately, ████████████████████

████████████████████ and to say the least, it was an unfortunate and tragic way of

life for them. *See id*.

     No one provided refuge for the children. They were left to fend for themselves for days at

a time. *See* Exhibit C. But even when Mr. Stager's mother was present, she would routinely direct

Mr. Stager to ██████████████████████████████████████████

████████████ *See id*. And, in instances where Mr. Stager's mother left her children in the care of

one of her brothers when she went out to work, ████████████████████████████

██████ *See id*. For Mr. Stager and his siblings, ██████████████████████████████.

These conditions were not ripe for young children to survive let alone thrive. Despite the darkness

faced in his childhood, this time period taught Mr. Stager to always strive for a better life and

instilled in him exceptional humanity and altruism.

     At around the age of six (6), Mr. Stager's mother abandoned him and his siblings at a motel.

*See* PSR at ¶ 75. He and his siblings were desperately in need of food, so they went knocking door-

to-door looking for help. *See* Exhibit C. Eventually, one motel guest answered the door, and she

fed the starving children and called the police after hearing that they were abandoned. *See id.* That

day, Mr. Stager and his siblings became wards of the State. *See* PSR at ¶ 75. Once placed into

foster care, Mr. Stager and his siblings hoped that better days were ahead. However, it was at this

point that Mr. Stager and his sister Anita were separated from their siblings, never to be seen again; this left them "devastated." *See* Exhibit C.

Despite their hopes, life in foster care proved to be very difficult for Mr. Stager and . Anita. While in foster care, they were both ████████████████████████████ and went to several homes. *See id.* The last home they lived in prior to their adoption was the home of "Ben and Linda." *See id.* In the two (2) years Mr. Stager and Anita spent as their foster children, ███ ████████████████████████. *See id.* ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

In 1988, Mr. Stager and Anita finally escaped the foster care system when they were adopted by Ron and Kathy Stager, who have two (2) biological children, Chuck Stager and Melissa Witcher. *See* PSR at ¶¶ 76-77. Following the adoption, the newly merged family relocated to Arkansas. *See id.* ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

Mr. Stager, Anita, and Melissa each left their family home at young ages due to tensions between each child and their parents. *See* Exhibit C. When Mr. Stager left the family home at the age of seventeen (17), he moved in with his best friend, Christopher Washam and his mother. *See* Exhibit E. While he has not been able to build a relationship where he fully trusts his adoptive parents, Mr. Stager grew very close to his adoptive maternal grandfather, Charles Waymack, who Mr. Stager maintained contact with until his passing four (4) or five (5) years ago. *See* PSR at ¶ 76.

In the wake of his childhood, Mr. Stager took his own experiences and used them to build a life filled with love to a degree he never imagined. On June 3, 2004, Mr. Stager married Samantha ("Nicole") Littell, a respiratory therapist for the Veteran's Administration Medical Center and Mr. Stager's "best friend." *See id.* at ¶ 79. In their "loving, successful household," Mr. Stager and his wife are raising two (2) children, ages fifteen (15) and seventeen (17), both of whom they are "very proud." *See id*. Mr. Stager's wife regards Mr. Stager as "a wonderful father" who is always "encouraging and supportive" of their children. *See id.* at ¶ 80.

Mr. Stager and his family are extremely close. *See id.* While they have been able to communicate regularly throughout his incarceration for the instant case, his incarceration has been nothing short of a "nightmare" for Mr. Stager and his family. *See id.* at ¶ 79. When Mr. Stager has communicated with his family, he is extremely apologetic and expresses that he feels foolish and

regretful for his behavior. *See id.* at ¶ 80. Fortunately, Mr. Stager has the "full support" of his family. *See id.* They know that his behavior in reference to the instant case is "very out of character." *See id.*

B.   **Education and Employment**

Mr. Stager attended Jacksonville High School in Jacksonville, Arkansas. *See* PSR at ¶ 95. During this time, Mr. Stager played baseball, track, and football. *See* Exhibit H. He was even sent a letter of interest from Penn University to play football. *See id.* Following graduation from high school in 1998, Mr. Stager focused his attention on employment. During his first job out of high school, Mr. Stager worked as a carpenter on the crew that built the William J. Clinton Presidential Library in Little Rock, Arkansas. While Mr. Stager has since been employed in a variety of different fields to support his family, over the years, he has built a reputation among his peers as an "excellent carpenter," Exhibit I, learning the trade from his grandfather. *See* PSR at ¶ 97-103.



[redacted]

[redacted]

[redacted]

---

[redacted]

### D.  Religion

Although Mr. Stager was raised in a Catholic household for most of his life, he increasingly embraced Islam since the 1990's. In the wake of his conduct on January 6, 2021, he found a great sense of direction in practicing Islam more devoutly. He continues to pray for Officer B.M. and has grown immensely through dedicated prayer and reflection.

### III.  THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *see Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *see id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49-50, "make an individualized assessment based on the facts presented," *id.*, and explain how the facts relate to the purposes of sentencing. *See id*. at 53-60; *see also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## IV.     THE APPLICABLE U.S. SENTENCING GUIDELINES RANGE

According to the plea agreement and the PSR in this matter, the following U.S. Sentencing

Guidelines sections apply:

**2021 Guidelines**

| | |
|---|---|
| U.S.S.G. § 2A2.2(a) – Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) – Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) – Victim Sustained Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) – Convicted under Section 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) – Official Victim | +6 |
| **Adjusted Offense Level (Subtotal)** | **29** |
| U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility | -2 |
| U.S.S.G. § 3E1.1(b) – Acceptance of Responsibility | -1 |
| | _____ |
| **Total Offense Level** | **26** |

*See* PSR at ¶¶ 52-64.

Mr. Stager has a criminal history score of zero (0); he, therefore, has a Criminal History

Category of I for sentencing purposes. *See* PSR at ¶ 68. Mr. Stager's Total Offense Level of

twenty-six (26) combined with a Criminal History Category of I produces a Guidelines' range of

sixty-three (63) to seventy-eight (78) months. *See id.* at ¶ 114.

## V.     18 U.S.C. § 3553(a) FACTORS

As the Court is well aware, the Sentencing Guidelines are not mandatory, and while the

Court must consult the Guidelines and take them into account at sentencing, *see United States v.*

*Booker*, 125 S. Ct. 738, 767 (2005), Section 3553(a)(1) provides a "broad command to consider

'the nature and circumstances of the offense and the history and characteristics of the defendant.'"
*Gall*, 552 U.S. at 50 n. 6. The command is consistent with the Supreme Court's observation that
"the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. at 1240
(citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). It is similarly consistent with Congress'
express directive that "[n]o limitation shall be placed on the information" a sentencing court may
consider "concerning the [defendant's] background, character, and conduct." *Id.* (citing 18 U.S.C.
§ 3661).

### A.      The Nature and Circumstances of the Offense

On January 5, 2021, Mr. Stager was working as a truck driver and was in Washington, D.C.
due to a scheduling conflict with his dispatch. *See* Exhibit A. After delivering the load of produce
he was transporting nearby, he made the choice not to drive back to Arkansas empty due to the
cost of fuel and the fact that he would not be making money on an empty load. *See id.* Mr. Stager
then decided to make the most of the situation and watch the speech of outgoing President Trump
the next day; this decision is one that Mr. Stager will regret for the rest of his life. *See id.*

As Mr. Stager writes, "I take full responsibility for my actions … I was naïve, reckless,
selfish, and emotionally unstable … I have caused a wake of devastation and pain to my loved
ones, my community, and many others." *See id*. More importantly, Mr. Stager writes a separate
letter to the officer he assaulted. *See* Exhibit AA. He tells the officer that "this is one of the hardest
letters I've penned to paper," and sincerely apologizes for his actions – "I would like you to know
that I'm sorry for any harm or injury you may have endured due to my actions or indirect actions
on that tragic day." *See id*. He explains that he does not "have hatred toward law enforcement, let
alone for anyone," and that he often tries to put himself in the officer's shoes that day. When he
does, he is "horrified" at the position the officers were in and what they endured. *See id*. Although

he recognizes how difficult it might be, he prays that he and the officer can one day "have an open dialogue," so that they may "move forward in a positive and meaningful way." *Id.*

On January 6, 2021, Mr. Stager arrived at the National Mall, completely unaware "that danger loomed in the background." *See* Exhibit A. But things took a drastic turn. When Mr. Stager reached the crowd at the Capitol, joyous songs about America rang through the air. *See id.* That joy dissipated as soon as Mr. Stager felt a tickle in his throat and realized that the cloud that overcame him was tear gas; this is when he discerned "we were in danger." *See id.* The crowd became "an ocean of panicked people," and Mr. Stager watched in anguish as chaos unfolded before his very eyes. *See id.* Mr. Stager felt compelled to assist those in trouble, and he had been previously trained on two (2) occasions to assist in life saving measures. *See id.* "As [he] entered the fr[a]y to help the injured by handing water out," he observed a group of individuals covered in "vomit, snot, and some blood," who appeared to be in shock. *See id.*

Mr. Stager continued his efforts to render aid and, before long, he "came upon a woman who was on the ground" who was getting crushed as people "cascade[ed] down on top of each other." *See id.* Fortunately, Mr. Stager was able to help bring her to her feet. *See id.*; Exhibit N.

Not long after, Mr. Stager observed an elderly man trapped under of a pile of people who was bleeding from his head and appeared to be in severe pain. *See id.* Mr. Stager pled for help, yelling, "Stop pushing! Stop pushing! They're going to die!" *See id.* Ultimately, the man, who was overcome with pain, directed Mr. Stager to leave him. *See id.* He moved along so he could continue to try to help others.

As he tried to maintain his balance and regain focus, Mr. Stager noticed someone else on the ground. *See id.* While making his way to the individual, Mr. Stager tried his best to signal to officers in an attempt to get them to cease macing him while he attempted to assist the person in

need. *See id.*; Exhibit N. Once Mr. Stager reached the individual, he observed that she did not appear to be breathing or have eye movement and was "grey in tone." Exhibit A; *see* Exhibit N. In this moment, Mr. Stager was overcome with emotion. *See id.* Everything went silent. *See* Exhibit A. Hoping officers would step in and help the individual to safety, Mr. Stager yelled to officers, "This person is dead! They are dead!" *See id.* Mr. Stager soon realized that the officers were likely in fear of their own safety; no help was coming. *See id.* But, moments later, Mr. Stager and another member of the crowd assisted in dragging the lifeless body away from the epicenter of the mayhem to a location where aid was being provided. *See id.*; Exhibit N; *see also* Exhibit O (showing subsequent efforts to render the individual aid); Exhibit M (same). Mr. Stager "was in a state of absolute shock and horror." *See id.*; Exhibit N; *see also* Exhibit L (showing the moments following Mr. Stager's efforts to subsequently render aid). What is ever so clear now, but was not in that moment, is that Mr. Stager's emotional state was in turmoil. *See* Exhibit A. Mr. Stager watched as another unconscious person was dragged to safety. *See id.* He reached his breaking point. *See id.* His vision blurred for a moment; then, in concert, his vision and hearing came back. *See id.* Mr. Stager heard someone direct a member of the crowd to pick up a flag lying on the ground; Mr. Stager complied without a thought. *See id.* At this point, he was seeing red. The next few moments will forever haunt Mr. Stager. The last thing he ever wanted was to hurt someone.

He is shaken, devastated, and in disbelief in light of his actions on January 6, 2021. *See id.* Indeed, later that very day, when his adrenaline subsided, Mr. Stager began to search within himself to try to understand how he could behave in such a manner and why this transpired. He even tried to coordinate with local police to turn himself in. *See* Exhibit B.

After years of being incarcerated, ███████████████████████ ███████████████████████, Mr. Stager realizes that his past likely caught up with him

on that day. In the months leading up to January 6, 2021, ███████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████

     Mr. Stager is sorry for his "outrageous behavior and to any officer[s] who were injured, [his] family, and our Republic for any shame [he has] brought upon them." *See* Exhibit A He is heartbroken by the fact that he "caused a wake of devastation and pain to [his] loved ones, [his] community, and many others," and that his "best friend and wife of 19 years along with [their two (2)] beautiful children have been deprived of [his] physical [presence] due to [his] conduct and have suffered tremendously." *See id.* In addition to the great sadness he feels for the officer he struck, it pains Mr. Stager to know that his actions are the reason why his daughter has been without "a shoulder to cry on and the security of a protect[i]on that dads are supposed to provide" and why his son has been "robbed . . . of some of the most important social and memorable moments of his high school years and his young life." *See id.*

     But Mr. Stager is taking the lessons he and his wife teach their children to heart. "[W]hen we stumble, mess up, or just fail at something . . . [i]t's how we move forward that matters. Own it and move forward in a positive manner but correct the issue or behavior." *See id.* Mr. Stager hopes more than anything that his wife "can forgive [him] for [his] thoughtlessness and the betrayal to [their] family's best interest," and that he will be able to rejoin his family "soon so [they] may be able to piece [their] family back together again." *See id.* Mr. Stager is "certain that [he] will do everything in [his] power to prevent this type of horror from ever happening again." *See id.*

### B.    Mr. Stager's Personal History and Characteristics

     Mr. Stager's life has been defined by hardship, adversity, and improving his life and the lives of others. Mr. Stager's loved ones speak with one voice as they talk about a man who shines

brightly among others. *See* Exhibit B-I. According to his sister Anita, Mr. Stager is "very hardworking, family oriented, positive, kind, loving, devoted, friendly, understanding, giving, funny, laid back, open minded, [and] thoughtful." *See* Exhibit C. For many people, Mr. Stager "keeps [them] going and has always been the positive light [they] need in [their] life." *See id.*

In her letter of support, Mr. Stager's wife, Nicole Littell, states that Mr. Stager "has always been a giving person to those who need help." *See* Exhibit B. He is "an extremely kind, caring, and thoughtful human being." *See id*. To put it simply, he embraced the charitable spirit others showed him from time to time during his childhood. Furthermore, another longtime friend, Gary Washam, describes Mr. Stager as "a man that will let a friend b[o]rrow anything he has, and expect nothing in return." *See* Exhibit F. He is the "type of person that you want to find if you are stuck on the side of the road in the middle of nowhere." *See* Exhibit B.

Ms. Littell recalls a time when she and Mr. Stager were in a parking lot and a couple approached them asking for money. *See id.* Upon speaking with the husband, Mr. Stager learned that the man and his family were a few dollars short of getting a hotel for the night. *See id.* Mr. Stager "not only gave this gentleman some cash but he also went to the hotel and paid for [two (2) or three (3)] nights for this couple so their children would have a bed to sleep in." *See id.* While this might seem like exceptional kindness, such kindness is the norm for Mr. Stager. On "numerous occasions," for example, Mr. Stager invites homeless gentlemen near his jobsite to lunch so that he can buy them food. *See id.* Ms. Littell recounts when Mr. Stager ended up in the emergency room for heart issues while working construction in San Francisco, California. *See id.* Ms. Littell immediately flew to see Mr. Stager, and, when she arrived at his job site, she noticed a man sleeping on the sidewalk with a blanket—a blanket she later learned was the blanket Mr. Stager kept in his van. *See id.* She also came to learn that Mr. Stager regularly took that man to lunch. *See*

*id.* "Acts like these are the normal everyday things that [Mr. Stager] does." *See id.* Accordingly, there is no shortage of stories of Mr. Stager's exceptional kindness.

What comes to mind for Christopher Washam, Mr. Stager's best friend since childhood, is Mr. Stager "spend[ing] his free time in school helping teach art to special education students." *See* Exhibit E. Additionally, Mr. Stager's sister Anita, recalls his efforts to organize a Christmas donation drive for the children of the general population inmates at D.C. Jail. *See* Exhibit C.

Mr. Stager extends this same kindness and devotion to his loved ones. Mr. Stager "has always been very helpful to friends with his [skill in and] knowledge of carpentry and construction." *See* Exhibit I. In her letter to the Court, Mrs. Heslip, a close family friend, shares a time when Mr. Stager learned that their water heater broke while Mrs. Heslip's husband was out of town. *See id*. Without even being asked, Mr. Stager went to their home, removed the old water heater, and purchased and installed a new one with his own money. *See* Exhibit G. Mrs. Heslip and her children were met with a wonderful surprise when they had hot water upon their return home. *See id.*

It is truly "second nature to [Mr. Stager] to take care of those around him." *See* Exhibit B. To this point, Mr. Stager's sister Anita remembers a time that he picked her up from a battered women's shelter and welcomed her into his home until she got on her feet. *See* Exhibit C.  Mrs. Heslip reflects on the care and support Mr. Stager provided for her children, including her son ███ ███████ to ensure he always feels included. *See* Exhibit I. Again, exceptional love and selflessness is the standard by which Mr. Stager lives.

Given Mr. Stager's big heart and disposition, it should be no surprise, as Mr. Washam writes, that he built a beautiful life for him and his "wonderful family." *See* Exhibit E. "[He] has always been a supportive husband and father to his family and helped them be the best that they

could be in life." *Id.* He has "sacrificed to make his family's life better than his growing up." *Id.* Mr. Stager's wife describes Mr. Stager as a "wonderful husband and an amazing nurturing father to his children." *See* Exhibit B. "He has a very close and loving relationship with his children," who can "talk with him about anything." *See* Exhibit C.

Mr. Stager has "always been very involved with his children's school." *See* Exhibit B. Ms. Littell recalls that, when their son was in Pre-K, Mr. Stager "brought and cut out wood for bird houses for not just his son's class but the entire [P]re-[K]. *See id*. He spent a whole day at the school helping each child build and decorate their own bird house." *See id.* Ms. Littell recounts that when their children where in elementary school, Mr. Stager "was on a first name basis with the Principal, [Assistant] Principal, office staff, and all the teachers," "volunteered for Watch Dog Dads" (a group aimed at providing mentorship for children in need of positive male role models), "read books to the younger classes," and was involved with the PTA, where his efforts included helping to get volunteers from local companies for the school's annual float parade. *See id.*; *see also* Exhibit E. Mr. Washam also fondly remembers Mr. Stager taking the initiative to volunteer as a security guard at his daughter's elementary school for the two (2) years before she entered middle school. *See* Exhibit E.

Mr. Stager "is a jack of all trades," *see* Exhibit C, and "has always strived to be excellent at any job or task he is set out to do," *see* Exhibit E and D. Mr. Washam submits that Mr. Stager is "probably one of the best and hardest workers [he has] ever known." *See id.* Ronnie Washam, who has known Mr. Stager since he was around eleven (11) years-old, reflects on Mr. Stager's standout work ethic and notes that Mr. Stager has "worked hard to provide for his family." *See* Exhibit D. Since his father-in-law, William Littell, has known him, Mr. Stager "has always had a job or a business of his own." *See* Exhibit I. Mr. Stager makes many personal sacrifices to provide

his family the life he only dreamed of as a child, including having to "travel far from home for his job to provide for his family." *See* Exhibit G.

Mr. Stager's work ethic remains ever-present and is readily demonstrated even during his detention. *See* Exhibit J. In his Inmate Performance Rating from November 28, 2022, for example, Mr. Stager received a rating of "excellent" in all categories, which includes "dependability, safety, care of equipment," "initiative," and "quality of work." *See id.* Corporal Abdullah, who conducted Mr. Stager's performance review wrote additional commentary, providing, among other things, that Mr. Stager "was put in several times [that] quarter for special pay because of the above and beyond work ethic and willingness to do whatever it took to meet the moment." *See id.*

Mr. Stager already has a plan for when he is released. Once released, Mr. Stager hopes to use his carpentry talents to build tiny homes for the homeless population. Mr. Stager also plans to employ all that he has learned during the instant case to effectuate prison reform; this aspiration is already in the works.

Mr. Stager's love and commitment has been an example to others throughout his life. While those closest to him acknowledge his actions that have brought him before this Court, they remain steadfast in their love and support of Mr. Stager, secure in their belief in  a man who is exceptionally dedicated, caring, and thoughtful—exactly the type of person who deserves this Court's leniency.

### C.    Mr. Stager's Poses Little Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Stager does not fit the archetype of a person who will commit new criminal offenses or recidivate. And, because of the reinvigorated role of the judiciary in sentencing, judges can now

impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected, as the Guidelines' offense level has long been recognized as "[n]ot intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker*, 125 S. Ct. 738, has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Stager's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically, with respect to Mr. Stager, who is forty-four (44) years old, defendants between the age of forty-one (41) and fifty (50) with no criminal history have a recidivism rate of only six-point-nine percent (6.9%). *Id.* at 28. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Stager would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Stager are rarely reconvicted of a crime. In fact, only three-point-five percent (3.5%) of first offenders with zero (0) criminal history points are ever reconvicted. *See U.S. Sentencing Comm'n, Recidivism and the First Offender*, at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Only eleven-point-seven percent

(11.7%) of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). *See id*. The instant conviction is Mr. Stager's first felony conviction, and the experience taught him a valuable life lesson to ensure he does not repeat the mistakes of the past.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data. Such data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Stager is not a person who is statistically likely to recidivate. And, when one considers such statistics in light of Mr. Stager's personal history and characteristics, it is safe to assume that he will never again be arrested or charged with an offense.

For Mr. Stager's loved ones, with whom he has celebrated life's joys and sorrows, "[a]rguably, the most sorrowful moment happened on [January] 6, 2021." *See* Exhibit G. They were left with questions such as, "[H]ow could this have happened? How could [Mr. Stager] have been involved?" *Id.* To put it simply, his conduct was "completely out of character." *See* Exhibits B, C, and F.

Mr. Stager is not the violent, hateful individual the government paints him to be. *See* ECF No. 333 at 14. Mr. Stager "has a gentle soul," *see* Exhibit B, and "has always had respect for law enforcement/officers and the law," *See* Exhibit C. In the more than twenty (20) years they have known each other, Ms. Littell does not recall an instance where Mr. Stager has shown "any type of anger much less violence." *See id.* She and others are certain that Mr. Stager's conduct on January 6, 2021 will be "an isolated incident" for him. *See id.*; *see also* Exhibits C, E, and I. Indeed, Ms. Littell remembers how, in the immediate aftermath, Mr. Stager called her to tell her he "was coming straight home to turn himself in"; he was "mortified" by his conduct. *See* Exhibit B. Mr.

Stager then called the local sheriff's office to speak with a sheriff the family knows so that he could arrange to turn himself in. *See id.*

In the wake of his actions, Mr. Stager has had to confront many harsh realities. Upon facing them, he has sincerely committed himself to self-improvement. He is devastated by his actions and the fact that they have jeopardized his family's wellbeing. The Court can rest assured that Mr. Stager "will never violate the law again" or "be in this type of situation in the future." *See* Exhibits C and I.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Despite its best efforts, the government has been inconsistent with its plea offers and sentencing recommendations for similarly situated January 6 defendants. Sentences should not vary drastically simply because of a discrepancy in plea offers. This is especially the case where the offensive conduct was much more egregious than Mr. Stager's and the defendant was allowed to plead to only 18 U.S.C. § 111(a). This is significant because of the two-level guideline enhancement that applies with a guilty plea to 18 U.S.C. § 111(b).

***Unwarranted Disparities in Plea Offers***

Mr. Stager's request for time served is appropriate in light of cases where the facts are on par with or more egregious than those in Mr. Stager's case.  In a number of instances, defendants were allowed to plead under Section 111(a) where their conduct was more egregious than Mr. Stager and others who  pled guilty  under Sections 111(a) and (b).

For example, Joshua Hernandez pled guilty to one (1) count of Section 231(a)(3) and one (1) count of 111(a). *See United States v. Hernandez*, No. 1:22-cr-42-CRC. He was sentenced to

twenty-four (24) months of imprisonment after the Court declined to apply the dangerous weapon enhancement for Mr. Hernandez's use of a flagpole to hit an officer in the head. *See id.* In addition to his assaultive conduct, Mr. Hernandez climbed through a window to enter the Capitol, where he infiltrated the Speaker's Conference Room and Senate Gallery, struck a door in the hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office.

The facts in this case are less egregious. *See id.* In contrast with Mr. Hernandez, who used a flagpole to strike a body part containing a vital organ before infiltrating many significant spaces in the Capitol, Mr. Stager hit Officer B.M. on the legs with a plastic flagpole and then went to render more aid to injured people before removing himself from the area and reflecting on his conduct in horror. *See* Exhibit M and O.

Mr. Stager's sentencing request is further supported by Howard Richardson's case. *See United States v. Richardson*, No. 1:21-cr-721-CKK. Mr. Richardson pled guilty to one (1) count of Section 111(a) for his conduct on January 6, 2021, which included bringing a long, metal flagpole and using it to strike an officer three (3) times (only stopping after it broke on the third hit) and using an enormous metal Trump sign as a battering ram against officers. *See id.* During his plea hearing, Mr. Richardson made false representations to the Court. *See id.* Additionally, while he awaited sentencing, Mr. Richardson was arrested for aggravated assault and lied to the local police about his conduct. *See id.* Despite his reprehensible conduct in the aftermath of January 6 and the fact that he was on bail for Illegal Possession of a Firearm, Mr. Richardson was ultimately sentenced to forty-six (46) months' imprisonment, the government's recommended sentence. *See id.* Mr. Stager's offensive conduct involved a plastic flagpole that he found on the ground when he was caught up in an emotional episode; he used his own willpower to discontinue his conduct, as opposed to continuing until the flagpole broke. Once the adrenaline wore off, Mr. Stager

immediately called his wife to tell her he was horrified by his actions and that he was going to turn himself in upon returning to Arkansas. *See* Exhibit B. He then called a local sheriff to arrange to turn himself in. *See id.*

Gregory Nix's case is also instructive. Mr. Nix was sentenced to forty-two (42) months of imprisonment, far below his Guidelines' range and the government's recommendation of seventy (70) months, after pleading to one (1) count of Section 111(a) and (b). *See United States v. Nix*, No. 1:21-cr-678-BAH. Mr. Nix attempted to breach the East House Doors by banging the end of a flagpole against the door. *See id.* He eventually gained entry into the Capitol, and, while inside, used a baton to bang against the East House Doors. *See id.* Mr. Nix verbally engaged with officers and used a flagpole to hit an officer in the head before thrusting and throwing the flagpole at the officer. *See id.* Prior to January 6, Mr. Nix wrote in a text message that he had "no problem with tar and feathering" when the individual he was conversing with commented January 6 may get violent. *Id.* On the contrary, Mr. Stager did not arrive at the Capitol intending to hurt anyone. Moreover, he did not strike an officer in a body part containing a vital organ or infiltrate the Capitol.

Grayson Sherrill's case provides another helpful comparison. Mr. Sherril was sentenced to seven (7) months' imprisonment for violently striking an officer who was separated from the CDU line with a metal pole and then entering the Capitol, banging on various doors with his metal pole. *See United States v. Sherril*, No. 1:21-cr-28-TSC. After he left the building, Mr. Sherrill climbed on a government vehicle and watched the continued chaos as officers tried to reclaim the Capitol. *See id.* Following his conduct on January 6, Mr. Sherril deleted videos that he took at the Capitol from his cell phone. *See id.*

A sentence of time served is also appropriate given the sentences rendered where more than one (1) officer was assaulted. For example, Robert Sanford, who had a Guidelines' range of sixty-three (63) to seventy-eight (78) months received a fifty-two (52) month sentence after pleading guilty to one (1) count of Section 111(a) and (b).  Mr. Sanford struck three (3) officers in the head with a fire extinguisher and threw a traffic cone at officers. *See United States v. Sanford*, No. 1:21-cr-86-PLF.

Even where defendants assaulted more than one (1) victim, because of the six (6) level-increase in cases where defendants were required to plead to Section 111(a) and (b), *see* U.S.S.G. §§ 2A2.b(b)(2)(B), 2A2.2(b)(7), a calculation which arguably constitutes double-counting, defendants received drastically lower sentences where they were allowed to plead guilty to only Section 111(a). For instance, Mark Leffingwell pled to one (1) count of Section 111(a) where he punched two (2) officers a total of three (3) times. *See United States v. Leffingwell*, No. 1:21-cr-5-ABJ. He was sentenced to six (6) months of incarceration where the government was requesting twenty-seven (27) months. *See id.*

Ricky Willden,  a member of the Proud Boys, was sentenced to twenty-seven (27) months of incarceration following  his guilty plea to one (1) count of Section 111(a). *See United States v. Willden*, No. 1:21-cr-423-RC. On January 6, 2021, Mr. Willden, who was wearing goggles that he brought with him, assaulted numerous officers with a chemical irritant, subsequently threw the emptied canister at officers, and entered the Capitol. *See id.* Following the day's events, Mr. Willden deleted messages and videos from Facebook. *See id.* Despite his conduct, Mr. Willden was not required to plea to the more serious offense Section 111(a) and (b) and did not receive the dangerous weapon enhancement. *See id.*

Additionally, given that assault charges do not group, and, therefore, at least a two (2) level increase in such cases would be required, defendants such as Mr. Leffingwell, Mr. Sanford, and Mr. Willden received a true benefit of the bargain in being allowed to plea to only one (1) count. Mr. Stager did not receive a similar benefit or consideration.

***Mr. Stager's Co-Defendants***

Mr. Stager's codefendants pled guilty to one (1) count of Sections 111(a) and (b), 2, despite the fact that their conduct was far more egregious. In contrast to Mr. Stager, Mr. Stager's co-defendants engaged in more than one (1) attack on officers and each assaulted more than one (1) victim. Additionally, Logan Barnhardt was allowed to plead to an offer that did not include the dangerous weapon enhancement. *See* ECF No. 234.

Logan Barnhardt was sentenced below his Guidelines range to thirty-six (36) months of incarceration, following his guilty plea to one (1) count of Sections 111(a) and (b), 2, the same charge to which Mr. Stager has pled guilty. *See United States v. Barnhardt*, 1:21-cr-00035-RC-6. As co-defendant Jack Whitton was attacking an officer, Mr. Barnhardt climbed over a banister and went up a set of steps towards the officer in the Tunnel Archway. *See id.* Mr. Whitton grabbed the officer first by his baton and then by the helmet and the neck of his ballistic vest. *See id.* As he did this, Mr. Barnhardt grabbed the officer's neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs. *See id.* Several minutes later, Mr. Barnhardt returned to the Archway, where others were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. *See id.* There, he joined others in charging against the police line and pushed other people from behind, supporting them and propelling them forward into the line of officers. *See id.* Mr. Barnhardt then approached the line of officers wielding a flagpole and used it to strike the officers. *See id.* In the plea agreement, the

parties agreed to a Guidelines' calculation that did not include the dangerous weapon enhancement. *See* ECF No. 234.

Justin Jersey was sentenced to fifty-one months of incarceration after entering a guilty plea to one (1) count of Sections 111(a) and (b), 2. *See United States v. Jersey*, 1:21-cr-00035-RC-9. As part of his sentence, Mr. Jersey was ordered to pay more than $32,000 for the serious bodily injury caused by his actions. *See id.* Mr. Jersey charged at the line of officers protecting the entrance to the Tunnel; this set into motion a large-scale assault on multiple officers, including direct violence from Mr. Jersey. *See id.* While Officer A.W. was positioned at the front of the Archway, Mr. Jersey "grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face with his other hand," grappling over the baton for several seconds and knocked Officer A.W. to the ground. *Id.* Mr. Jersey then grabbed another baton and used it to strike other officers in the Archway. *See id.* While other assaults were occurring, Jersey picked up Officer A.W.'s helmet and put it on his own head; Jersey left Washington, D.C. with Officer A.W.'s helmet, another officer's helmet, and an officer's badge; Jersey displayed one of those helmets behind the bar in his home. *See id.* Prior to January 6, 2021, Mr. Jersey exchanged Facebook messages that indicated that he anticipated that violence would occur and that he would have a weapon with him. Mr. Jersey, accordingly, brought a large, gnarled stick. *See id.*

In addition to his conduct on January 6, Mr. Jersey's criminal history demonstrates a troubling relationship with weapons and a tendency to resort to violence; he has a conviction stemming from a domestic dispute and he was arrested for (but not ultimately charged with) possessing a firearm with serial number that had been altered after a rifle was recovered following a dispute between Mr. Jersey and the mother of one (1) of his children. *See id.*

Mason Courson pled to one (1) count of Sections 111(a) and (b), 2, the same charge to which Mr. Stager pled. *See United States v. Courson*, 1:21-cr-00035-RC-8.  He was sentenced to fifty-seven (57) months' imprisonment for his conduct on January 6, 2021. *See id.* On January 6, Mr. Courson was an initial member of the mob that forcibly entered the Tunnel Archway. *See id.* Over the course of several minutes, Mr. Courson made his way deeper into the Tunnel and, along with others, forcefully pushed and shoved the crowd towards the line of officers stationed in the Tunnel. *See id.* As he was pushed out of the Tunnel, Mr. Courson reached towards officers and grabbed at their equipment, including their protective gear. *See id.* The officers were eventually able to push Mr. Courson and others out of the Tunnel. *See id.* Once officers pushed Mr. Courson out of the Tunnel, Mr. Courson armed himself with a police baton on the steps outside the Tunnel. *See id.* About an hour later, Mr. Courson and numerous others attacked a line of officers positioned in the Archway. *See id.* In the scuffle, an officer was dragged down a set of stairs, where Mr. Courson struck the officer with the baton, injuring the officer. *See id.* When the officer attempted to ascend the steps back to the police line, Mr. Courson and others pushed him back down the steps and prevented him from re-joining the line. *See id.* Mr. Courson then ascended the steps to the Archway and attempted to grab another officer who was still on the ground fending off attacks. Mr. Courson kept the baton, as if it were a trophy in which he should take great pride. *See id.*

### *Dangerous Weapon Enhancement*

Since Mr. Stager entered his guilty plea, at least one (1) court has declined to apply the dangerous weapon enhancement provided in U.S.S.G. § 2A2.2(b)(2)(B) where the defendant used a flagpole, *see United States v. Hernandez*, No. 1:22-cr-42-CRC, or similar object, *see United States v. Wilson*, No. 1:21-cr-345-RCL (declining to apply the enhancement where the defendant

struck two (2) officers with a PVC pipe), to effectuate the charged assault. It is  appropriate for the Court to vary downward regarding the  dangerous weapon enhancement in Mr. Stager's case, as he used a plastic flagpole that he did not bring with him on January 6, 2021. *See* PSR at ¶ 54.

### E.  Mr. Stager's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." Arguably, the government has already substantially achieved the maximal deterrent effect of Mr. Stager's offense simply by charging and convicting him. As a result, Mr. Stager's name and the substance of his offense will be discussed in numerous conversations and settings among family, friends, and the community for years to come, a disheartening reality from which he simply cannot escape. In short, Mr. Stager's public demise sends a strong message to anyone foolish enough to engage in similar offenses.

## VI.    OTHER MITIGATING CIRCUMSTANCES

Courts have discretionary authority to depart downward in cases where they find a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). This Court should depart downward in light of Mr. Stager's ████████████████████████████████████████████████████████

████████████████████████████████████

### A.  Post-Offense Rehabilitation

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

[redacted]

## VII.    CONCLUSION

In light of the above, Mr. Stager respectfully requests that the Court impose a sentence of time served.

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy G. Barbari
D.C. Bar No. 1032106
Amy C. Collins
D.C. Bar No. 1708316
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
Rammy@pricebenowitz.com
AmyC@PriceBenowitz.com

*Counsel for Peter Francis Stager*

**EXHIBIT LIST**

| Exhibit Name | Page Number(s) | Description |
|---|---|---|
| Exhibit A | 10, 11, 12 | Exhibit A _Client Ltr |
| Exhibit B | 12, 13, 14, 15, 19, 21 | Exhibit B_Littell, Nicole_Ltr of Support |
| Exhibit C | 2, 3, 4, 13, 14, 15, 16, 19 | Exhibit C_Stager, Anita_Ltr of Support |
| Exhibit D | 16 | Exhibit D_Washam, Ronnie_Ltr of Support |
| Exhibit E | 4, 14, 15, 16 | Exhibit E_Washam, Christopher_Ltr of Support |
| Exhibit F | 14 | Exhibit F_Washam, Gary_Ltr of Support |
| Exhibit G | 15, 16, 19 | Exhibit G_Heslip, Jean_Ltr of Support |
| Exhibit H | 5 | Exhibit H_Stager, Ronald_Ltr of Support |
| Exhibit I | 5, 14, 15, 16 | Exhibit I_Littell, William_Ltr of Support |
| Exhibit J | 16 | Exhibit J_Work Performance Rating and Letter from Squad Supervisor |
| Exhibit K | | Exhibit K_Family Pictures |
| Exhibit L | 11 | Exhibit L_DefVideo1 |
| Exhibit M | 11, 21 | Exhibit M_DefVideo2 |
| Exhibit N | 11 | Exhibit N_DefVideo3 |
| Exhibit O | 11, 21 | Exhibit O_DefVideo4 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 14th day of July 2023, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.


_____/s/_____
David Benowitz
Rammy G. Barbari
Amy C. Collins