No. 23-

In the

# Supreme Court of the United States

GARRET MILLER,

*Petitioner,*

*v.*

UNITED STATES OF AMERICA, *et al.,*

*Respondents.*

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the District of Columbia Circuit

## PETITION FOR A WRIT OF CERTIORARI

David B. Smith
   *Counsel of Record*
Nicholas D. Smith
David B. Smith, PLLC
1123 Broadway, Suite 909
New York, New York 10010
(917) 902-3869
dbs@davidbsmithpllc.com

F. Clinton Broden
Broden & Mickelsen LLP
2600 State Street
Dallas, Texas 75204

*Counsel for Petitioner*

322749



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTIONS PRESENTED

Whether the obstruction-of-justice offenses in 18 U.S.C. § 1512(c) cover only acts that affect the integrity or availability of evidence, or whether they criminalize advocacy, lobbying and protest in connection with congressional proceedings that are neither inquiries nor investigations, such as Congress's joint session to certify the Electoral College vote count.

Whether § 1512(c)'s "corruptly" element requires proof that the defendant acted with the intent to obtain an unlawful benefit, or whether it merely requires proof that the defendant acted with an improper or wrongful purpose or through unlawful means.

*ii*

## RELATED PROCEEDINGS

*United States v. Fischer*, No. 22-3038 (D.C. Cir. Apr. 7, 2023)

*United States v. Miller*, No. 22-3041 (D.C. Cir. Apr. 7, 2023)

*United States v. Edward Lang*, No. 22-3039 (D.C. Cir. Apr. 7, 2023)

*United States v. Miller*, 1:21-cr-0119-CJN (D.D.C. Mar. 7, 2022)

*United States v. Fischer*, 1:21-cr-00234-CJN (D.D.C. Mar. 15, 2022)

*United States v. Edward Lang*, 1:21-cr-00053-CJN (D.D.C. June 7, 2022)

*Edward Lang v. United States*, No. 23-32

*iii*

## LIST OF PARTIES

- Garret Miller, Petitioner

- United States of America, Respondent

- Joseph Fischer, Respondent

- Edward Lang, Respondent

*iv*

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . .i

RELATED PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . ii

LIST OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . vi

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . vii

OPINIONS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . .1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATUTORY PROVISION INVOLVED . . . . . . . . . . .1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . .6

    A.   Factual Background  . . . . . . . . . . . . . . . . . . . . . .6

    B.   Procedural Background  . . . . . . . . . . . . . . . . . . .6

REASONS FOR GRANTING THE PETITION. . . . .20

*v*

*Table of Contents*

*Page*

A.  Hundreds of political protesters have been mistakenly exposed to Section 1512(c)(2)'s 20-year statutory maximum sentence; protected political expression in the Nation's Capital, and ordinary legislative business, are at stake . . . . . . . . . . . . . 20

B.  The courts of appeals have struggled for decades with the obstruction-of-justice term "corruptly" . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.  The D.C. Circuit's *Fischer* decision conflicts with this Court's precedents rejecting improbably broad interpretations of criminal statutes . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.  This case is an appropriate vehicle to address Section 1512(c)(2)'s reach . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*vi*

## TABLE OF APPENDICES

*Page*

APPENDIX A — MEMORANDUM OPINION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, FILED MAY 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — MEMORANDUM OPINION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, FILED MARCH 7, 2022 . . . . . . . . . . . . . . . . . . . . .20a

*vii*

## TABLE OF CITED AUTHORITIES

*Page*

**CASES**

*Almendarez-Torres v. United States,*
  523 U.S. 224, 118 S. Ct. 1219,
  140 L. Ed. 2d 350 (1998) . . . . . . . . . . . . . . . . . . . . . . .28

*Begay v. United States,*
  553 U.S. 137 (2008). . . . . . . . . . . . . . . . . . . . . . . 7, 8, 13

*Bond v. United States,*
  572 U.S. 844, 134 S. Ct. 2077,
  189 L. Ed. 2d 1 (2014). . . . . . . . . . . . . . . . . . . . . . .27, 31

*Continental Can Co. v. Chicago Truck Drivers,*
  *Helpers and Warehouse Workers Union*
  *(Independent) Pension Fund,*
  916 F.2d 1154 (CA7 1990). . . . . . . . . . . . . . . . . . . . . . .31

*Dubin v. United States,*
  __U.S.__, 143 S. Ct. 1557,
  216 L. Ed. 2d 136 (2023) . . . . . . . . . 3, 5, 28, 29, 30, 31

*Epic Sys. Corp. v. Lewis,*
  584 U.S. __, 138 S. Ct. 1612,
  200 L. Ed. 2d 356 (2018) . . . . . . . . . . . . . . . . . . . . . . .28

*FTC v. Bunte Bros.,*
  312 U.S. 349, 61 S. Ct. 580,
  85 L. Ed. 881, 32 F.T.C. 1848 (1941). . . . . . . . . . . . . .16

*viii*

*Cited Authorities*

*Page*

*Herrmann v. Cencom Cable Assocs., Inc.,*
978 F.2d 978 (CA7 1992) . . . . . . . . . . . . . . . . . . . . . . .31

*Jeannette Rankin Brigade v.*
*Chief of Capitol Police,*
342 F. Supp. 575 (D.D.C. 1972),
*aff'd mem.*, 409 U.S. 972 (1972) . . . . . . . . . . . 2, 22, 24

*Johnson v. United States,*
576 U.S. 591 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Lederman v. United States,*
291 F.3d 36 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . .22

*Marinello v. United States,*
138 S. Ct. 1101 (2018) . . . . . . . . . . . . . . . . .5, 11, 25, 30

*Marx v. General Rev. Corp.,*
568 U.S. 371 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*McDonnell v. United States,*
579 U.S. 550, 136 S. Ct. 2355,
195 L. Ed. 2d 639 (2016) . . . . . . . . . . . . . . . . . . . . . . .31

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886, 102 S. Ct. 3409,
73 L. Ed. 2d 1215 (1982) . . . . . . . . . . . . . . . . . . . . . . .23

*ix*

*Cited Authorities*

*Page*

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75, 118 S. Ct. 998,
140 L. Ed. 2d 201 (1998) . . . . . . . . . . . . . . . . . . . . . . . .18

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018). . . . . . . . . . . . . . . . . . . . . . . . . .5

*United States v. Aguilar,*
515 U.S. 593 (1995) . . . . . . . . . . . . . . . . . . . . . . . .25, 26

*United States v. Felipe Antonio Martinez,*
1:21-cr-00392-RCL (D.D.C. 2021) . . . . . . . . . . . . . .22

*United States v. Garret Miller,*
589 F. Supp. 3d 60 (D.D.C. 2022) . . . . . . . . . . . . . . . .7

*United States v. North,*
910 F.2d 843 (D.C. Cir. 1990). . . . . . . . . . . . 25, 26, 27

*United States v. Poindexter,*
951 F.2d 369 (D.C. Cir. 1991). . . . . . . . . . . . . . . .15, 27

*United States v. Reeves,*
752 F.2d 995 (5th Cir. 1985) . . . . . . . . . . . . . . . .25, 26

*United States v. Spears,*
729 F.3d 753 (CA7 2013). . . . . . . . . . . . . . . . . . . . . . .30

*United States v. Stephanie Hazelton,*
1:21-cr-00030-JDB (D.D.C. 2021). . . . . . . . . . . . . . .22

*x*

*Cited Authorities*

Page

*United States v. Williams,*
  553 U.S. 285 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Van Buren v. United States,*
  141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021). . . . . . . . . . .30

*Yates v. United States,*
  574 U.S. 528 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## CONSTITUTION, STATUTES & RULES

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . 3-4, 17

18 U.S.C. § 924(e)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 1028A(a)(1) . . . . . . . . . . . . . . . . . . . . . . . .27, 28

18 U.S.C. § 1503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

18 U.S.C. § 1503(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 1512 . . . . . . . . . .8, 12, 14, 15, 16, 17, 18, 28, 30

18 U.S.C. § 1512(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 1512(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . .8

18 U.S.C. § 1512(a)(3)(B) . . . . . . . . . . . . . . . . . . . . . 14-15

*xi*

*Cited Authorities*

*Page*

18 U.S.C. § 1512(a)(3)(c) . . . . . . . . . . . . . . . . . . . . . . . . . .15

18 U.S.C. § 1512(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

18 U.S.C. § 1512(c) . . . . . . . . . .   1, 2, 7, 8, 9, 12, 17, 18, 19

18 U.S.C. § 1512(c)(1) . . . . . . . . . . . . . . . .1, 7, 8, 12, 14, 29

18 U.S.C. § 1512(c)(2) . . . . .1-2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,
                   13, 14, 15, 16, 17, 19, 20, 21, 22, 23,
                   24, 26, 29, 30, 31, 32

18 U.S.C. § 1512(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

18 U.S.C. § 1512(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . .17

28 U.S.C. § 1254(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

40 U.S.C. § 5104(e)(2)(G) . . . . . . . . . . . . . . . . . . . . . . . . .22

Sup. Ct. R. 10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 20

**OTHER AUTHORITIES**

*30 Months Since the Jan. 6 Attack on the Capitol*,
    Department of Justice Press Release, July
    6, 2023, available at: https://www.justice.
    gov/usao-dc/30-months-jan-6-attack-
    capitol#:~:text=Approximately%2011%20
    individuals%20have%20been,restricted%20
    federal%20building%20or%20grounds . . . . . . . . . . .21

*xii*

*Cited Authorities*

*Page*

*Attorney General Merrick B. Garland Statement
on the Second Anniversary of the January
6 Attack on the Capitol*, Department of
Justice Press Release, Jan. 4, 2023, available
at: https://www.justice.gov/opa/pr/attorney-
general-merrick-b-garland-statement-
second-anniversary-january-6-attack-capitol . . . . .21

Black's Law Dictionary 894 (11th ed 2019). . . . . . . . . .28

*Corruptly*, Black's Law Dictionary (11th ed. 2019) . . . .25

*Forbes Breaking News, Tom Cotton Asks Deputy
AG If DOJ Will Investigate 'Democratic Mob'
Disrupting Tennessee Legislature*, YouTube
(Apr. 19, 2023), https://www.youtube.com/
watch?v=DAQ1g5hC824&t=159s . . . . . . . . . . . . . .24

Jason Willick, *This Jan. 6 Case Could Make
U.S. Politics Even Worse*, Wash. Post
(Apr. 13, 2023), available at: https://www.
washingtonpost.com/opinions/2023/04/13/
justice-department-jan-6-legal-overreach/ . . 4-5, 23-24

*Obstruction Law Cited by Prosecutors
in Trump Case Has Drawn Challenges*,
N.Y.Times, July 20, 2023, available at: https://
www.nytimes.com/2023/07/20/us/politics/
trump-jan-6-obstruction-charge.html. . . . . . . . . . .23

Tejas Narechania, *Certiorari in Important Cases*,
122 Colum. L. Rev. 923 (2022) . . . . . . . . . . . . . . . . .20

1

Garret Miller respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the District of Columbia Circuit.

## OPINIONS BELOW

The opinion of the court of appeals is reported at 64 F.4th 329 and reprinted in the appendix to the petition for certiorari filed in *Edward Lang v. United States* (No. 23-32) ("EL App.") at 1-118. The opinion of the district court is reported at 589 F. Supp. 3d 60 and reprinted in the Appendix to the Petition ("Pet. App.") at 20a. The opinion of the district court denying reconsideration is reported at 605 F. Supp. 3d 63 and reprinted in the Appendix at 1a-19a.

## JURISDICTION

The judgment of the court of appeals was entered on April 7, 2023. Petitioner's motion for panel rehearing was denied in an order entered on May 23, 2023. EL App. 124. The Court has jurisdiction under 28 U.S.C. § 1254(1).

## STATUTORY PROVISION INVOLVED

Subsection (c) of Section 1512, title 18, provides:

(c) Whoever corruptly—

   (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

2

    (2)  otherwise obstructs, influences, or
           impedes any official proceeding, or
           attempts to do so,

  shall be fined under this title or imprisoned not
  more than 20 years, or both.

18 U.S.C. § 1512(c).

## INTRODUCTION

This Petition concerns a citizen's right to demonstrate at the place where protest is lodged in its "most pristine and classic form," the United States Capitol. *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.) (three-judge panel), *aff'd mem.*, 409 U.S. 972 (1972). Sometimes its form is less than pristine. In the two and a half years following the events at the Capitol on January 6, 2021, the federal government has charged over 1,060 protesters with offenses typically brought after a riot. Among them are the crimes of assault, property destruction, disorderly conduct in a restricted area, and parading or demonstrating in the Capitol Building. But the government has also indicted over 300 protesters under an obstruction-of-justice statute that, in the forty years of its existence before January 6, no court had ever applied to conduct that is not intended to affect the integrity or availability of evidence used in an inquiry or investigation. Before January 6, no court had characterized political protest at the seat of government, however disorderly, as an obstruction-of-justice offense sounding in Chapter 73 of Title 18.

In the Corporate Fraud Accountability Act of 2002, Congress enacted subsection (c) of Section 1512, titled "Tampering with a witness, victim or an informant," to

3

criminalize the corrupt obstruction of official proceedings, including its own legislative inquiries and investigations. The Act was addressed to a perceived loophole in Chapter 73 obstruction law identified in the aftermath of the Enron Corporation's accounting scandal: "corporate document-shredding to hide evidence of financial wrongdoing." *Yates v. United States*, 574 U.S. 528, 535-36 (2015). Yet Congress's quadrennial joint session to count Electoral College votes on January 6 does not invoke the legislature's power of inquiry, unlike congressional investigations with subpoena power. It is undisputed that Petitioner, a protester at the Capitol that day, did not tamper with evidence. The government has thus advanced against Petitioner and hundreds of other January 6 protesters an unprecedented application of Section 1512(c)(2), decoupled from investigations and evidence, by "riffing on equivocal language" in a criminal statute. *Dubin v. United States*, __U.S.__, 143 S. Ct. 1557, 216 L. Ed. 2d 136, 154 (2023) (internal quotation marks omitted). And this particular riffing marked a timely volte-face: before January 6, Attorney General and Office of Legal Counsel memoranda had rejected this evidence-free interpretation of Section 1512(c)(2).

The district court dismissed the Section 1512(c)(2) charge against Petitioner, finding the government's novel interpretation of the statute inconsistent with statutory text, interpretive canons, this Court's precedents and statutory history. And while the D.C. Circuit reversed that decision, it did so in a deeply divided triad of opinions. Adding to the complication, both the concurring and dissenting opinions agreed that the government's novel construction of Section 1512(c)(2) in the January 6 cases would create a breathtakingly broad, vague and unconstitutional provision that trespasses on core First

4

Amendment rights, including the fundamental right to petition the government for a redress of grievances.

In dissent, Judge Katsas neatly illustrated the error and danger spawned by the government's novel construction. Section 1512(c)(2) criminalizes corruptly "obstruct[ing], influenc[ing], or imped[ing]" an official proceeding. The government defines "corruptly" to mean acting with a wrongful or immoral purpose. Thus, if the obstruction-of-justice crime does not require an act intended to affect the integrity or availability of evidence, Congress would have intended Section 1512(c)(2) to criminalize "large swaths of advocacy [and] lobbying"—in Congress. EL App. 111. For the "tobacco or firearms lobbyist who persuades Congress to stop investigating how many individuals are killed by the product" may have corruptly "influence[d]" an official proceeding, if twelve petit jurors determine that the content of such policy advocacy reflects a "wrongful purpose." *Id.*

The Court should grant certiorari because the Court of Appeals has decided a vital question of federal law in a way that conflicts with this Court's decisions rejecting improbably expansive interpretations of criminal statutes. SUP. CT. R. 10(c). And the question is of national importance not merely because it could mistakenly result in 20 years' incarceration for hundreds of Americans engaged in political protest. The Court of Appeals' decision threatens all manner of future (and perhaps more palatable) political advocacy, protest, and lobbying, the more so as it is now the law in the locus of such civic activity, the Nation's Capital.[1]

---

1.   *See* Jason Willick, *This Jan. 6 Case Could Make U.S. Politics Even Worse*, Wash. Post (Apr. 13, 2023), available at:

5

Right at the sensitive pivot that balances protected political expression and the criminal law, the decision below places a clumsy weight on the side of criminalization, collapsing any conceptual distinction between a Class B parading-and-picketing misdemeanor and a 20-year obstruction-of-justice felony. The vague contours of this obstruction-of-justice offense against Congress that involves no evidence or investigation invites politicization of criminal justice. For "[v]ague laws invite arbitrary power." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018) (Gorsuch, J., concurring in part). And the courts of appeals have struggled for decades with the meaning of the obstruction-of-justice term "corruptly" without a definitive decision from this Court.

On the other side of the ledger, law enforcement gains are nonexistent here. Every traditional criminal act on January 6 is covered by a more specific criminal statute, such as those proscribing trespass and assault. The government's novel Section 1512(c)(2) crime parasitically sits atop those other offenses, drawing on their actus rei without itself criminalizing any unique misconduct or intent. "Time and again, this Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes." *Dubin*, 216 L. Ed. 2d at 153 (citing *Marinello v. United States*, 138 S. Ct. 1101 (2018)). That lodestar shines all the brighter in a case where Petitioner petitioned the government for a redress of grievances.

---

https://www.washingtonpost.com/opinions/2023/04/13/justice-department-jan-6-legal-overreach/.

6

## STATEMENT OF THE CASE

### A.   Factual Background

Miller was charged by criminal complaint on January 19, 2021. Dist. Ct. Dkt. 5 at 1.[2] The complaint alleged that on January 6, "around 2:40 p.m., Mr. Miller entered the Capitol building, where he joined a crowd of rioters pushing against a line of law enforcement officers in the Rotunda." Dist. Ct. Dkt. 5-1 at 5. Prior to January 6, Miller "made statements on his Facebook account that he was coming to D.C. for 'this trump shit,' that a 'civil war could start,' and that he intended to bring with him 'a grappling hook and rope and a level 3 vest' as well as a helmet, mouth guard, and a 'bump cap.'" *Id.* After January 6, Miller said he had "charged the back gates" [of the Capitol] himself." *Id.*

For this conduct Miller was later charged by indictment. The Third Superseding Indictment charged 12 counts, five of which were felonies, including one charging Miller, under Section 1512(c)(2), with corruptly obstructing, influencing and impeding an official proceeding, that is, Congress's joint session on January 6, 2021 to count Electoral College votes. Dist. Ct. Dkt. 111.

### B.   Procedural Background

1. Miller moved the district court to dismiss the Section 1512(c)(2) count in his indictment. The court

---

2.   "Dist. Ct. Dkt." refers to the docket in *United States v. Garret Miller* (D.D.C. No. 1:21-cr-00119-CJN). "Dkt." refers to the docket in *United States v. Fischer* (D.C. Cir. No. 22-3038). Miller's case, No. 22-3041, was consolidated with *Fischer* on appeal.

7

granted that relief in *United States v. Garret Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022) (Nichols, J.). The court emphasized that it must exercise restraint in assessing the reach of a criminal statute and that such restraint corresponds with the rule of lenity. Pet. App. 29a. Turning to the text, the court observed that "three readings of the statute are possible, but only two are plausible." *Id.* at 33a.

The first, advanced by the government, is that subsection (c)(2), which begins with the term "otherwise" and then states, "obstructs, influences, or impedes any official proceeding or attempts to do so[,]" constitutes a "clean break" from subsection (c)(1), setting forth an omnibus clause independent of the preceding subsection. But this interpretation failed to give meaning to the term "otherwise," rendering it surplusage. Moreover, the interpretation conflicted with how the Supreme Court had construed "otherwise" in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591, 604 (2015), which addressed a different statute but a similar statutory framework. Pet. App. 34a.

Under the second interpretation, subsection (c)(1) merely provides examples of conduct that violate subsection (c)(2). Here, the court acknowledged that this construction gave effect to the term "otherwise" by tethering the subsections through a common link to an "official proceeding." But the court found that this construction carried its own problems. For example, if the common element is an official proceeding, then "otherwise" is superfluous. And both subsections reference official proceedings. The court explained that the structure of Section 1512(c) cut against construing subsection (c)(1)

8

as merely including examples of conduct violating (c)(2). In the court's view, a reasonable reader would not expect the principal offense (indeed, only) to be in the second subsection with examples preceding it. Pet. App. 39a.

Finally, the court considered whether subsection (c)(2) constituted a residual clause for (c)(1). Under this construction, the word "otherwise" links the two subsections with the commonality being the conduct proscribed in (c)(1). And it squared with the Supreme Court's reasoning and holding in *Begay*. For instance, subsection (c)(2) ensures that by criminalizing specific acts in (c)(1) that impair object evidence Congress was not underinclusive in proscribing interference with the availability and integrity of all types of evidence. Pet. App. 41a.

Turning to statutory context, the court viewed it as supporting a narrow focus in subsection (c)(2). For instance, the court noted that Congress aimed Section 1512's other subsections at discrete conduct in narrow circumstances, like killing a person to prevent their attendance at an official proceeding. Pet. App. 46a. (citing 18 U.S.C. § 1512(a)(1)(A)).

Looking next to the statutory history, the court found that it too reinforced construing subsection (c)(2) as a catchall. On this point, the court traced the development of Section 1512(c) and observed that it filled in a missing gap, that is, not requiring that the obstructor act through another person. This circumscribed aim also bolstered a narrow purpose interpretation. Pet. App. 49a.

Last, the court addressed the legislative history while acknowledging its limited role. Here, the court

9

recounted the history surrounding Section 1512(c)'s enactment as part of the Sarbanes-Oxley Act of 2002. As the court emphasized, nearly all of the legislative history cited the purpose of the Section 1512(c) amendment as deterring fraud and abuse by corporate executives, such as shredding potentially incriminating documents, as occurred with Enron and Arthur Anderson, LLP. In other words, federal authorities could prosecute individuals under Section 1512(c) when they acted alone and before the existence of a proceeding and a subpoena. Pet. App. 55a.

In sum, the district court held that the conduct of Miller on January 6, which was not linked to any evidence impairment, fell outside Section 1512(c)'s contemplation. The court later denied the government's motion for reconsideration in a 20-page opinion. Pet. App. 1a.

2. The government filed an interlocutory appeal of the district court's dismissal order, as well as similar orders entered in two other Section 1512(c)(2) cases. On appeal Miller's case was consolidated with *United States v. Fischer* (D.C. Cir. No. 22-3038) and *United States v. Edward Lang* (D.C. Cir. No. 22-3039). The D.C. Circuit reversed the district court's order, though in a decision where no two opinions appeared to constitute a plurality on the dispositive legal issues: the mens rea and actus rei requirements of Section 1512(c)(2). The panel issued three separate opinions. EL App. 1-118.

In the lead opinion, Judge Pan conceded that there was no precedent for applying Section 1512(c) to the conduct unrelated to evidence impairment at issue, and that such application was beyond Congress' expressed purpose in amending that section. Yet Judge Pan viewed

10

the terms in Section 1512(c)(2) to be clear, unambiguous, and supporting a broad reading. Indeed, she characterized any argument to the contrary as "implausible" based on Congress' chosen language. Consistent with this view, Judge Pan declined to find any inconsistency with the statutory context, historical development, and legislative history. And absent a "grievous ambiguity," Judge Pan did not believe the rule of lenity had any role to play. EL App. 9-45.

As to the government's argument that the mens rea of the "corruptly" element limited the statutory reach of its interpretation, Judge Pan demurred. At the outset, she observed that the district court declined to interpret "corruptly," the parties only discussed this issue "peripherally," and no one requested the standard adopted by Judge Walker's concurrence.[3] EL App. 22. For those reasons and because assault allegations, in her view, satisfied any mens rea standard, Judge Pan did not reach the issue. *Id.* And she offered that the definition adopted in Judge Walker's concurrence should, for the

---

3.   The meaning of "corruptly" was fully briefed in *Fischer*. The government's brief itself argued that the district court's vagueness concerns were overdone precisely because the government's definition of "corruptly" provided guardrails. Dkt. 1958170 at 63. Miller also fully briefed the "corruptly" element and indeed argued for the definition settled on by Judge Walker. Dkt. 1963748 at 44. At oral argument the parties argued the "corruptly" element for "around fifteen minutes." EL App. 49 n. 1. (Walker, J., concurring in part). Indeed, "[a]t argument, the Government asked [the D.C. Circuit] to 'construe' 'corruptly' 'consistent with [its] plain language.'" *Id.* The Court of Appeals also "benefitted from the lengthy discussion of the ["corruptly"] issue by several district judges in similar cases." *Id.*

11

same reasons, await briefing in a different case. Finally, Judge Pan emphasized that Judge Walker's concurring opinion warranted no precedential effect. *Id.* at 23.

Judge Walker concurred in the judgment. Yet the judge made plain that his concurrence in the judgment was conditioned on a definition of "corruptly" developed in his opinion—and not shared by Judge Pan. EL App. 48 n. 1. ("[M]y vote to uphold the indictments depends on it."). Absent that definition, Judge Walker repeatedly characterized the government's construction of Section 1512(c)(2)'s actus rei and mental state as breathtaking in scope, subjecting it to vagueness and overbreadth concerns. On that point, Judge Walker's views aligned with those of Judge Katsas in dissent. But Judge Walker differed with the dissent on the best way to address those problems. In Judge Walker's judgment, the most efficient way to narrow the breathtaking scope resulting from the lead opinion's construction was through the mens rea element— "corruptly." EL App. 46-72.

Judge Walker rejected the government's definition of the "corruptly" element: acting with a wrongful or immoral purpose or through unlawful means. Tracing legal history back to Tudor England and through the Sarbanes-Oxley Act, Judge Walker defined "corruptly" to require "proof that the defendant not only knew he was obtaining an 'unlawful benefit' but that his 'objective' or 'purpose' was to obtain that unlawful benefit." EL App. 60 (quoting *Marinello*, 138 S. Ct. at 1114). Judge Walker explicitly stated, "If I did not read 'corruptly' narrowly, I would join the dissenting opinion. That's because giving 'corruptly' its narrow, long-established meaning resolves otherwise compelling structural arguments for affirming

12

the district court, as well as the Defendants' vagueness concerns." EL App. 70 n. 10.

In dissent, Judge Katsas found the government's interpretation mistaken because Section 1512(c)(2) is an evidence-impairment crime. The government's evidence-free construction:

> dubiously reads *otherwise* to mean "in a manner different from," rather than "in a manner similar to." For another, it reads the catch-all provision in subsection (c)(2) to render ineffective the longer, more grammatically complex list of [evidence impairment] examples in subsection (c)(1), which is inconsistent with normal linguistic usage and with several canons reflecting it. The government's reading is also hard to reconcile with the structure and history of section 1512, and with decades of precedent applying section 1512(c) only to acts that affect the integrity or availability of evidence. Moreover, the government's reading makes section 1512(c) implausibly broad and unconstitutional in a significant number of its applications. Finally, if all of that were not enough, these various considerations make the question presented at least close enough to trigger the rule of lenity.

EL App. 73.

Judge Katsas observed that linguistic analysis and the related canons of *ejusdem generis* and *noscitur a sociis* counsel that the specific examples of evidence impairment listed in subsection (c)(1) that precede the

13

word "otherwise" in subsection (c)(2) inform the reader's understanding of the more general, abstract terms in the latter provision. EL App. 82. Judge Katsas cited to this Court's decision in *Begay*, another case involving an "otherwise clause."

In *Begay*, this Court considered what constitutes a "violent felony" under the Armed Career Criminal Act. The definition extends to any crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). As Judge Katsas summarized the case:

> The question presented was whether a DUI offense falls within the residual *otherwise* clause. Answering no, the Court expressed no doubt that drunk driving "presents a serious potential risk of physical injury to another," at least as those words are commonly understood. But it held that the residual clause "covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" 553 U.S. at 142. The Court explained that "to give effect to every clause and word of th[e] statute, we should read the examples as limiting the crimes that [the residual clause] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 143 (cleaned up). For if Congress "meant the statute to be all encompassing, it is hard to see why it would have needed to include the examples [preceding the "otherwise clause"] at all." *Id.* at 142.

14

EL App. 81-82. Judge Katsas reasoned that the analysis was no different with respect to the relationship between the specific evidence-impairment crimes listed in subsection (c)(1) of Section 1512 and the broader, more abstract provisions in subsection (c)(2), a part of the same sentence. *Id.*

Judge Katsas further observed that it is a "'cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.'" EL App. 91 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). The government's interpretation creates "three levels of problematic surplusage." *Id.* First, if Section 1512(c)(2) criminalizes every act that obstructs, influences or impedes an official proceeding without regard to evidence impairment, "it would collapse subsection (c)(1) into subsection (c)(2)." Yet "'the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.'" *Id.* (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013)). And subsections (c)(1) and (c)(2) "are not just part of the same statutory scheme; they are part of one sentence, and they share a single mens rea requirement and a single authorized punishment." *Id.*

Second, "the government's reading also would collapse most of section 1512 into the subsection (c)(2) catchall. Section 1512 sets forth 21 different offenses, and the government's reading would fold at least 15 of them into subsection (c)(2)." EL App. 93. Judge Katsas noted that this "wholesale surplusage is even stranger given section 1512's graduated penalty scheme." *Id.* For example:

> Section 1512(a) authorizes terms of imprisonment of up to 30 years for various obstructive acts involving the use of physical force, 18

15

U.S.C. § 1512(a)(3)(B), and up to 20 years for obstructive acts involving the threat of physical force, *id.* § 1512(a)(3)(C). Section 1512(b) authorizes terms of up to 20 years for obstructive acts involving intimidation. *Id.* § 1512(b). Section 1512(d) authorizes maximum terms of only three years for obstructive acts involving harassment. *Id.* § 1512(d). By collapsing most of section 1512 into its subsection (c)(2), the government's interpretation would lump together conduct warranting up to three decades of imprisonment with conduct warranting at most three years—a distinction reflected in the broader structure of section 1512.

EL App. 94.

Third, and even more expansively, the government's evidence-free interpretation of subsection (c)(2) "would swallow up various other chapter 73 offenses outside of section 1512." Consider:

Two of the most longstanding chapter 73 offenses are sections 1503 and 1505, which trace back at least to 1909. *See United States v. Poindexter*, 951 F.2d 369, 380, 292 U.S. App. D.C. 389 (D.C. Cir. 1991). Section 1505 prohibits corruptly obstructing proceedings pending before Congress or executive agencies. Absent an act of terrorism, it imposes a maximum sentence of five years. Under the government's reading of section 1512(c)(2), all 197 words of this section are made surplusage by 13 words nested in a subparagraph of a subsection in the

16

> middle of section 1512. Section 1503 prohibits corruptly influencing a juror or court officer and, absent an attempted killing or a class A or class B felony, authorizes a maximum sentence of ten years. 18 U.S.C. § 1503(b)(3). The government's interpretation of subsection (c)(2) makes that part of section 1503 redundant, leaving only its separate application to acts of harming protected persons after the fact.

EL App. 95.

Judge Katsas further observed that Department of Justice memoranda from the Attorney General and Office of Legal Counsel supported a construction of Section 1512(c)(2) that limited it to "acts that impair the integrity or availability of evidence." EL App. 88. Moreover, "until the January 6 prosecutions . . . all the caselaw had involved conduct plainly intended to hinder the flow of truthful evidence to a proceeding." *Id.* at 89 (collecting cases). Section 1512(c)(2), the Judge recounted,

> has been on the books for two decades and charged in thousands of cases—yet until the prosecutions arising from the January 6 riot, it was uniformly treated as an evidence-impairment crime. This settled understanding is a "powerful indication" against the government's novel position. *FTC v. Bunte Bros.*, 312 U.S. 349, 351-52, 61 S. Ct. 580, 85 L. Ed. 881, 32 F.T.C. 1848 (1941).

EL App. 105.

17

Judge Katsas evoked the improbable outcomes created by decoupling Section 1512(c)(2) from investigations and evidence:

> Consider a few basic examples. An activist who successfully rails against bringing a bill to a vote on the Senate floor has obstructed or influenced an official proceeding. (For purposes of section 1512, the proceeding "need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1).) A lobbyist who successfully persuades a member of Congress to change a vote has likewise influenced an official proceeding. So has a peaceful protestor who, attempting to sway votes, holds up a sign in the Senate gallery before being escorted away. Of course, this case involves rioting as opposed to peaceful advocacy, lobbying, or protest. But the construction of section 1512(c) adopted by my colleagues will sweep in all of the above. And this breadth is especially problematic because section 1512 applies to congressional and executive proceedings as well as judicial ones. There is no constitutional or historical pedigree for lobbying to influence judicial decisions in pending cases. But advocacy, lobbying, and protest before the political branches is political speech that the First Amendment squarely protects.

EL App. 108.

Turning to the statutory history, Judge Katsas examined the background to Section 1512(c)'s enactment in the Corporate Fraud Accountability Act of 2002.

18

Subsection (c) was designed to fill the so-called "Arthur Andersen loophole." Before the Act was passed, Section 1512 reached "indirect" obstruction, by which the defendant induced others to tamper with evidence, but did not reach a defendant's "direct" tampering. The government argued that by plugging the loophole with subsection (c), Congress necessarily intended to make surplusage of the rest of Section 1512 because "indirect" obstruction is only one form of "direct" obstruction. Judge Katsas located the flaw in this argument:

> The government posits that Congress plugged the loophole with a grossly incommensurate patch. On its view, instead of simply adding a prohibition on direct evidence impairment to preexisting prohibitions on indirect evidence impairment, Congress added a prohibition on obstructing or influencing *per se*. My colleagues acknowledge the mismatch, but they find it irrelevant because the governing text is unambiguous. *Ante* at 31. But the text is ambiguous, and this mismatch is another reason for resolving the ambiguity in the defendants' favor. Of course, legislation can sweep more broadly than the primary evil that Congress had in mind. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). However, if the text is ambiguous and an interpretation seems implausible "in light of the context from which the statute arose," that suggests things have gotten off track.

EL App. 104.

19

Judge Katsas addressed Judge Walker's position that a narrowed definition of the "corruptly" element would resolve the overbreadth in the government's novel interpretation of Section 1512(c)(2):

> The concurrence's approach is driven by a laudable goal—narrowing what the concurrence recognizes would otherwise be the "breathtaking" and untenable scope of the government's interpretation of section 1512(c). *Ante* at 1, 3 n.1, 14-15, 22 n.10 (opinion of Walker, J.). But even with the concurrence's torqued-up *mens rea*, section 1512(c)(2) still would have improbable breadth. It would continue to supercharge comparatively minor advocacy, lobbying, and protest offenses into 20-year felonies, provided the defendant knows he is acting unlawfully in some small way.

EL App. 114-15.

In sum, in Judge Katsas's view, the Court of Appeals "should have acknowledged that Congress limited the [Section 1512(c)(2)] *actus reus* to conduct that impairs the integrity or availability of evidence." EL App. 116.

3. Miller moved the Court of Appeals for a panel rehearing, arguing that no two opinions constitute a plurality on Section 1512(c)(2)'s mens rea and actus rei requirements. Dkt. 1996380. The Court denied the motion on May 23, 2023. EL App. 124. Following the *Fischer* decision, Miller pled guilty to the other counts in the Third Superseding Indictment and was sentenced to 38 months' incarceration. However, the government has committed to

20

bringing Miller to trial on the remaining Section 1512(c)
(2) charge and asserts that if he is convicted, it will result
in a Sentencing Guidelines range higher than the one
under which he was sentenced on the other counts. Dist.
Ct. Dkt. 141 at 46.

Miller and Appellee Fischer also moved the D.C.
Circuit to stay the mandate pending resolution of
certiorari petitions. Dkt. 2001075. The Court granted
Miller's and Fischer's motions. Dkt. 2003281. Petitioner
Edward Lang did not file a motion to stay the mandate,
which will therefore be returned to the district court in
his case. *Id.*

## REASONS FOR GRANTING THE PETITION

**A.  Hundreds of political protesters have been
     mistakenly exposed to Section 1512(c)(2)'s 20-
     year statutory maximum sentence; protected
     political expression in the Nation's Capital, and
     ordinary legislative business, are at stake**

Historically, cases arising from and embodying
significant political developments have been commonly
deemed to raise "important question[s] of federal law"
under Supreme Court Rule 10(c). Tejas Narechania,
*Certiorari in Important Cases*, 122 Colum. L. Rev.
923, 974 (2022). So have federal questions of national
importance that affect a broad segment of society and
not merely the petitioner. *Id.* Doubtless, the questions
presented here clear that bar.

For a start, the events of January 6 were of historical
magnitude. For over two years following the riot, the

21

event has dominated not just national but international news. It is a constant subject of fractious nationwide political debate. For its part, the Department of Justice has described its January 6-related prosecutions as "one of the largest, most complex, and most resource-intensive investigations in our history." *Attorney General Merrick B. Garland Statement on the Second Anniversary of the January 6 Attack on the Capitol*, Department of Justice Press Release, Jan. 4, 2023, available at: https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-statement-second-anniversary-january-6-attack-capitol. Thus, the broader context in which this Petition arises is surely of national importance.

Central to that historical investigation is the obstruction-of-an-official-proceeding offense at issue. Over 300 protesters, hailing from virtually every State, have been charged under Section 1512(c)(2). *30 Months Since the Jan. 6 Attack on the Capitol*, Department of Justice Press Release, July 6, 2023, available at: https://www.justice.gov/usao-dc/30-months-jan-6-attack-capitol#:~:text=Approximately%2011%20individuals%20have%20been,restricted%20federal%20building%20or%20grounds. That all these citizens have been mistakenly subjected to Section 1512(c)(2)'s 20-year statutory maximum sentence for conduct that overlaps with protected political expression certainly makes the Petition's issues important questions of federal law.

Vagueness in the government's novel Section 1512(c)(2) crime has also created chaos in the administration of justice across hundreds of January 6 cases. Hundreds of protesters who entered the Capitol Building that day have been charged solely with a parading, picketing or

22

demonstrating offense, a Class B misdemeanor with a six-month maximum sentence, 40 U.S.C. § 5104(e)(2)(G), while hundreds of others who did the same thing, like Petitioner, have been charged with felony obstruction. If one "demonstrates" or "parades" in the Capitol (§ 5104(e)(2)(G)) during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object. § 1512(c)(2). But those charged under Section 1512(c)(2) and who therefore allegedly acted with a "wrongful purpose" (the government's definition of "corruptly") shared that purpose with the misdemeanants who "demonstrated" or "paraded" against electoral vote certification in the Capitol. That is, the government and courts are taking virtually identical defendants and sentencing them in divergent and arbitrary ways.

Nor is the novel Section 1512(c)(2) charge reserved for protesters who entered the Capitol Building. It has been filed against citizens who protested on the Capitol Grounds that day—and who are not accused of assault or property destruction. *E.g.*, *United States v. Felipe Antonio Martinez*, 1:21-cr-00392-RCL (D.D.C. 2021); *United States v. Stephanie Hazelton*, 1:21-cr-00030-JDB (D.D.C. 2021). They have been charged with the novel obstruction crime even though it has been settled law for decades that the Capitol Grounds, to include the Capitol steps, are a public forum for political expression, *Lederman v. United States*, 291 F.3d 36, 42 (D.C. Cir. 2002), where protesters have a right to "parade, stand, or move in processions or assemblages." *Jeannette Rankin Brigade*, 342 F. Supp. at 577. Perhaps the government believes that those rights lose force when exercised in close proximity to other protesters who commit crimes like assault. That too would

23

be mistaken. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 888, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (in a boycott that combined "elements of criminality and elements of majesty," protesters did not lose their right to picket because some members engaged in violence).

Elevating the national political salience of the issues raised here, it appears that the former president of the United States, and candidate in the 2024 presidential election, will be charged under the same Section 1512(c)(2) theory of liability that the government has filed against Petitioner and hundreds of others. *Obstruction Law Cited by Prosecutors in Trump Case Has Drawn Challenges*, N.Y.Times, July 20, 2023, available at: https://www.nytimes.com/2023/07/20/us/politics/trump-jan-6-obstruction-charge.html.

Perhaps most important of all is the threat of future applications of the government's novel Section 1512(c)(2) crime. It is not enough to point out that the vagueness inherent in this new crime against Congress would invite—has perhaps already invited—the politicization of criminal justice. As Judge Katsas warned, the new influencing- Congress-with-a-wrongful-purpose crime will inevitably call for value judgments to be made by prosecutors, judges and juries about what types of actuating political beliefs are "wrongful" or "immoral." EL App. 112-15. Hence, prominent legal observers have noted that the *Fischer* decision "bless[es] a significant expansion of the federal government's power to punish political activity it opposes." Jason Willick, *This Jan. 6 Case Could Make U.S. Politics Even Worse*, Wash. Post (Apr. 13, 2023), available at: https://www.washingtonpost.com/opinions/2023/04/13/justice-department-jan-6-

24

legal-overreach/. Likewise, at least one U.S. Senator has raised similar concerns in the wake of *Fischer. Forbes Breaking News, Tom Cotton Asks Deputy AG If DOJ Will Investigate 'Democratic Mob' Disrupting Tennessee Legislature*, YouTube (Apr. 19, 2023), https://www.youtube.com/watch?v=DAQ1g5hC824&t=159s.

The problem is worse. It is no exaggeration to say that the novel crime could interfere with, or at least have a chilling effect on, the basic mechanics of government. Lobbyists and policy advocates are an integral part of the lawmaking ecosystem. As Judge Katsas pointed out, they may now be prosecuted for "influencing Congress with a wrongful purpose," EL App. 112-15, for that is the necessary result of decoupling the Section 1512(c)(2) offense from investigations and evidence.

To be sure, no other court of appeals has decoupled the Section 1512(c)(2) offense from investigations and evidence. But to dwell on the absence of a split among the courts of appeals is to miss the point. Protest at the Nation's Capital—where it is exercised in its "most pristine and classic form," *Jeannette Rankin Brigade*, 342 F. Supp. at 584—by definition only occurs in the D.C. Circuit. Lobbying and policy advocacy in Congress only occur in the D.C. Circuit. The particular rights and interests at stake here do not arise in other circuits and yet they belong to citizens across the Nation who exercise them in Congress.

For all these reasons and others, the issues raised are important federal questions of national reach that should be settled by this Court.

25

## B. The courts of appeals have struggled for decades with the obstruction-of-justice term "corruptly"

Although the term "corruptly" is scattered across obstruction-of-justice crimes set out in Chapter 73, this Court has never squarely defined it in the contexts of judicial proceedings or congressional proceedings. Indeed, it is something of a legal chestnut that the term has long presented courts with a semantic conundrum. *E.g.*, *United States v. Reeves*, 752 F.2d 995, 998 (5th Cir. 1985). This case provides an opportunity for the Court to elucidate this ubiquitous but murky point of criminal law.

As indicated, Judge Walker rejected the government's definition of "corruptly": acting with an improper or unlawful purpose or through unlawful means. EL App. 48-64. The judge arrived at a different definition—acting with the intent to obtain an unlawful benefit that the defendant knows is unlawful—after canvassing precedents ranging "[f]rom Tudor England to state courts to federal statutes." EL App. 59 (citing *Marinello*, 138 S. Ct. at 1114 (Thomas, J., dissenting); *United States v. Aguilar*, 515 U.S. 593, 616-17, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995) (Scalia, J., concurring in part); *Reeves*, 752 F.2d at 998; *United States v. North*, 910 F.2d 843, 939-46 (D.C. Cir. 1990) (Silberman, J., concurring in part)). Black's Law Dictionary states that the word "corruptly," as used in criminal statutes, usually "indicates a wrongful desire for pecuniary gain or other advantage." *Corruptly*, Black's Law Dictionary (11th ed. 2019).

Yet as Judge Katsas cautioned in dissent, in modern cases federal courts have applied Judge Walker's

26

"corruptly" definition only in the tax law context. EL App. 114. Where the obstructed proceeding at issue is a judicial proceeding, courts have frequently defined "corruptly" in the manner proposed by the government. *E.g.*, *Aguilar*, 515 U.S. at 616-17 (Scalia, J., concurring in part) ("corruptly" may be synonymized with "wrongfully" in the judicial proceedings context because acts intended to obstruct trials and grand juries are corrupt per se); *Reeves*, 752 F.2d at 998 (same). And while D.C. Circuit precedent arising out of the Iran-Contra affair cases involving obstruction of Congress suggested that the congressional proceedings context requires a definition of "corruptly" different from that which obtains in judicial proceedings, those opinions were not the holding of the court. *North*, 910 F.2d at 944 (Silberman, J., concurring in part).

Here, the Court should clarify that Section 1512(c)(2)'s "corruptly" is defined in the manner proposed by Judge Walker—at least in the congressional proceedings context. As the Fifth Circuit explained in *Reeves*, jury instructions equating "corruptly" with acting with an "evil, immoral or wrongful" purpose have only applied in the judicial proceeding context, because "where a defendant has endeavored to obstruct a [judicial] proceeding, the advantage inconsistent with the duties and rights of others is so clear that courts have often been willing to impute the desire to obtain [] an [unlawful] advantage on a per se basis." 752 F.2d at 999. "Merely prohibiting 'bad,' 'evil,' and 'improper' purposes is very probably insufficient where . . . a [criminal] statute reaches . . . a broad[er] category of circumstances." *Id*.

And congressional proceedings like the one at issue here are paradigmatic examples of *Reeves*' "broader

27

category of circumstances," for, unlike in judicial proceedings, "[n]o one can seriously question that people constantly attempt, in innumerable ways, to obstruct or impede congressional committees." *North*, 910 F.2d at 882. Thus, in *United States v. Poindexter*, the D.C. Circuit determined that an acting-with-a-wrongful-purpose definition of "corruptly" was unconstitutionally vague as applied in the obstruction-of-Congress context. 951 F.2d 369, 386 (D.C. Cir. 1991).

This, too, is an important federal question, implicating national concerns (advocacy and protest in Congress), that should be settled by this Court.

### C. The D.C. Circuit's *Fischer* decision conflicts with this Court's precedents rejecting improbably broad interpretations of criminal statutes

Particularly in the last ten years, this Court has repeatedly rejected "improbably broad" interpretations of criminal statutes that would reach significant areas of innocent or previously unregulated conduct. *Bond v. United States*, 572 U.S. 844, 860, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014). *Fischer* is at cross-purposes with this seminal line of decisions.

Start with *Dubin*, which the Court decided this year. The healthcare-provider defendant overbilled Medicaid for psychological testing. He was charged with Medicaid fraud. But because the padded bills he submitted included patients' Medicaid reimbursement numbers (a "means of identification"), the government also charged him with aggravated identity theft under 18 U.S.C. § 1028A(a)(1). Section 1028A(a)(1) applies when a defendant, "'during and

28

in relation to any [predicate offense], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.'" *Dubin*, 216 L. Ed. 2d at 144 (quoting § 1028A(a)(1)).

The government argued that "use" means "use"; Dubin *used* patients' reimbursement numbers; and the use was "in relation to" his Medicaid fraud predicate crime. A Fifth Circuit panel affirmed the defendant's conviction and, on rehearing en banc, the court affirmed again. *Dubin*, 216 L. Ed. 2d at 145. This Court reversed unanimously. Common sense suggests that what the defendant did was not identity theft. The courts below had interpreted a criminal statute by narrowly focusing on dictionary definitions of isolated statutory words ("use" and "in relation to") without regard to any larger context. But "'a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words.'" *Id.* (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. __, __, 138 S. Ct. 1612, 200 L. Ed. 2d 356, 362 (2018)).

*Dubin* pointed to the statute's title: "Aggravated identity theft." Particularly where the statute's "key terms are so 'elastic,'" the title of a statute is a "'tool[] available for the resolution of a doubt about the meaning of a statute.'" *Dubin*, 216 L. Ed. 2d at 147 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)). Informed by the statute's title, *Dubin* arrived at a "more targeted definition of 'uses.' . . Identity theft encompasses when a defendant "'*uses* the information to deceive others . . .'" *Id.* (quoting Black's Law Dictionary 894) (11th ed 2019) (defining "identity theft"). Identically, Section 1512's title—"Tampering with a witness, victim or informant"—

29

provides a more targeted definition to Section 1512(c)(2)'s general terms "obstructs, influences or impedes"—*i.e.*, all acts that affect the integrity or availability of evidence used in an official proceeding.

The novel offense charged in *Dubin* satisfied the statute's abstract terms in some literal sense (the defendant indeed *used* another person's identity) and yet was not a crime because it conflicted with the basic meaning of "identity theft," the statute's titular purpose. Identically, the government argues here that its novel Section 1512(c)(2) offense satisfies the statute's abstract elements in a literal sense (protest in the Capitol "obstructs, influences, or impedes" proceedings there) and yet it omits the foundational components of every obstruction-of-justice crime under Chapter 73 (titled "Obstruction of Justice"): evidence and an investigation or inquiry.

*Dubin* employed the *noscitur a sociis* canon. Within the same sentence as the terms "use" and "in relation to" were the words "transfers" and "possesses." "Because 'transfer' and 'possess' channel ordinary identify theft, *noscitur a sociis* indicates that 'uses' should be read in a similar manner to its companions." 216 L. Ed. 2d at 151. Judge Katsas performed an identical analysis with respect to the evidence-related crimes in subsection (c)(1) of Section 1512 that immediately precede subsection (c)(2)'s general terms "obstructs, influences or impedes" in the same sentence. EL App. 77-81.

Finally, the "staggering breadth of the government's reading" in *Dubin* counseled against it. The Court has "'traditionally exercised restraint in assessing the reach of a federal criminal statute.'" *Dubin*, 216 L. Ed. 2d at

30

154 (quoting *Marinello*, 584 U.S. at __, 138 S. Ct. 1101, 200 L. Ed. 2d 356, 362). Such restraint arises "'both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understand[d] of what the law intends to do if a certain line is passed.'" *Id.* (quoting *Marinello*, 584 U.S. at __, 138 S. Ct. 1101, 200 L. Ed. 2d 356, 362). "'Crimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language.'" *Id.* (quoting *United States v. Spears*, 729 F.3d 753, 754 (CA7 2013) (en banc)).

Here, as Judge Katsas demonstrated, the "staggering breadth of the government's reading" swallows virtually every obstruction-of-justice offense in Chapter 73. EL App. 95. Where the Section 1512(c)(2) offense is cabined to acts that affect the integrity or availability of evidence— like every other crime in Section 1512—the terms "obstruct[], influenc[e] or impede[]" give fair warning to the world about what conduct is proscribed: the reasonable man knows that threatening witnesses, shredding relevant records, and suborning perjury are crimes. But where the offense is untethered to evidence, there is no conceptual lane to which the public can hew. Examples may be endlessly conjured. Is pogo sticking on the Capitol steps while shouting imprecations at the legislature now a 20-year felony, or is it merely an eccentric exercise of protected expressive conduct?

*Dubin* is only a start. In *Van Buren v. United States*, this Court rejected an interpretation of a computer fraud statute that "would attach criminal penalties to a breathtaking amount of commonplace computer activity." 141 S. Ct. 1648, 1661, 210 L. Ed. 2d 26 (2021).

31

In *McDonnell v. United States*, the Court rejected "expansive interpretation" of a bribery statute that would reach "normal political interaction between public officials and their constituents." 579 U.S. 550, 574-76, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016). And in *Bond*, the Court rejected an interpretation that would turn a chemical weapons statute "into a massive federal anti-poisoning regime that reaches the simplest of assaults." 572 U.S. at 863.

Judge Easterbrook summed up the relevant principle in this way: "Slicing a statute into phrases while ignoring . . . the setting of the enactment . . . is a formula for disaster." *Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 982 (CA7 1992); see also *Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F.2d 1154, 1157 (CA7 1990) ("You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities.").

If anything, the government's interpretation of Section 1512(c)(2) here is more imperial that its interpretations in *Dubin*, *Van Buren*, *McDonnell*, and *Bond*. For the government would have the courts extend the crime's territory from what Congress described as a loophole-filler for Arthur Andersen's document shredding to encompass the whole political world: criminalizing every act that influences or obstructs or impedes the Nation's legislature with a wrongful purpose.

32

### D.   This case is an appropriate vehicle to address Section 1512(c)(2)'s reach

Miller's case presents a clean vehicle to address the questions presented.

Miller's case is usefully contrasted with that of Petitioner Edward Lang (No. 23-32). The government alleges that Lang entered the Capitol's Lower West Terrace tunnel where, according to the government, "some of the most violent attacks on police officers occurred." Dkt. 1958170 at 24. The government further alleges: "Until approximately 5 p.m., Lang pushed, kicked, and punched officers, at times using a bar or a stolen riot shield." *Id.* In an interview on January 7, 2021, Lang described how he "had a gas mask on for the first two, three hours" as he was "fighting them face to face" as part of "a mission to have the Capitol building" and "stop this presidential election from being stolen." *Id.* According to Lang: "It was war. This was no protest." *Id.*

While Miller's conduct in entering the Capitol and pushing on police lines was wrong, he has accepted responsibility for his actions by pleading guilty to every valid offense with which he was charged—except the charge under Section 1512(c)(2). The charges to which Milled pled guilty already perfectly encompass all his misconduct that day. Thus, Miller's case captures the essential point that the novel obstruction charge does not penalize any unique criminal conduct or intent.

33

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for a writ of certiorari.

Respectfully submitted,

DAVID B. SMITH
  *Counsel of Record*
NICHOLAS D. SMITH
DAVID B. SMITH, PLLC
1123 Broadway, Suite 909
New York, New York 10010
(917) 902-3869
dbs@davidbsmithpllc.com

F. CLINTON BRODEN
BRODEN & MICKELSEN LLP
2600 State Street
Dallas, Texas 75204

*Counsel for Petitioner*

**APPENDIX**

*i*

## TABLE OF APPENDICES

*Page*

APPENDIX A — MEMORANDUM OPINION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, FILED MAY 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — MEMORANDUM OPINION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA, FILED MARCH 7, 2022 . . . . . . . . . . . . . . . . . . . . . .20a

1a

**APPENDIX A — MEMORANDUM OPINION
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
FILED MAY 27, 2022**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Criminal Action No. 1:21-cr-00119 (CJN)

UNITED STATES OF AMERICA,

v.

GARRET MILLER,

*Defendant.*

**MEMORANDUM OPINION**

In Count Three of a twelve-count Second Superseding Indictment, the United States charged Garret Miller with violating 18 U.S.C. § 1512(c)(2). *See* Second Superseding Indictment ("Indictment"), ECF No. 61 at 2-3. On March 7, 2022, the Court granted Miller's Motion to Dismiss, rejecting the government's broad interpretation of that statute. *United States v. Miller*, F. Supp. 3d , 2022 U.S. Dist. LEXIS 45696, 2022 WL 823070 (D.D.C. Mar. 7, 2022).

The government has since moved for reconsideration, arguing that the Court's prior interpretation regarding the scope of § 1512(c)(2) was incorrect. *See generally*

2a

*Appendix A*

Mot. for Reconsideration ("Mot."), ECF No. 75. In the alternative, the government contends for the first time that, even if the Court's statutory interpretation is correct, dismissal was not warranted because the Indictment provides Miller with sufficient notice of how he allegedly violated the statute under the Court's interpretation. *See generally id.* The Court disagrees on both scores.

## I.   Reconsideration of the Court's Prior Decision on the Scope of § 1512(c)(2) Is Not Warranted

The government argues that the Court should reconsider its prior decision because the government did not present the issue of "the degree of ambiguity required to trigger the rule of lenity" in its briefs opposing Miller's motion to dismiss. *See* Mot. at 8. But the parties did join issue on this specific question, *see* Opp. to Mot. to Dismiss, ECF No. 35, at 12 n.2 (discussing the degree of ambiguity required to trigger the rule of lenity); *see also* Supp. Br. in Resp. to Def.'s Second Supp., ECF No. 63-1 at 38 (same), and the Court was well aware of and considered the appropriate standard for the application of lenity, *see Miller*, 2022 U.S. Dist. LEXIS 45696, 2022 WL 823070, at *5. The government has pointed to no intervening change in law. Because a reconsideration motion is "not simply an opportunity to reargue facts and theories upon which a court has already ruled," the Court concludes that the government's lenity argument is not a basis for reconsideration. *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 80-81 (D.D.C. 2015) (internal quotation marks omitted).

3a

*Appendix A*

The government also contends that reconsideration is warranted because the Court erred in its interpretation of § 1512(c)(2) and because its decision conflicts with the decisions of other Judges in the District. *See generally* Reply, ECF No. 84. The Court has again carefully considered the government's arguments—presented here and in other cases pending before the Court—as to why the government's broad reading of § 1512(c)(2) is the correct one. The Court has also carefully considered the opinions from other Judges in the District on the issue.[1]

---

1. The Court notes that those decisions reach the same conclusion but for different reasons. For example, some opinions do not consider the relevance of the word "otherwise" in the statute at all, *see United States v. McHugh*, ("*McHugh I*"), 583 F. Supp. 3d 1, 2022 U.S. Dist. LEXIS 18138, 2022 WL 296304, at *12 (D.D.C. Feb. 1, 2022) (omitting "otherwise" even from its quotation of the statute); others mention the word but essentially omit any serious discussion of it, *see United States v. Nordean*, 579 F. Supp. 3d 28, 2021 U.S. Dist. LEXIS 246752, 2021 WL 6134595, at *6-7 (D.D.C. Dec. 28, 2021); and others suggest that it presents the key interpretive question, *United States v. McHugh*, ("*McHugh II*"), 2022 U.S. Dist. LEXIS 78655, 2022 WL 1302880, at *4 (D.D.C. May 2, 2022) (concluding "the meaning of 'otherwise' is central to the meaning of § 1512(c)(2)"). Other decisions appear to have concluded that § 1512(c)(1) acts as something of a carveout from § 1512(c)(2)'s otherwise broad terms, *see United States v. Reffitt*, 2022 U.S. Dist. LEXIS 81138, 2022 WL 1404247, at *8 (D.D.C. May 4, 2022), *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 2021 U.S. Dist. LEXIS 237131, 2021 WL 5865006, at *5 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 581 F. Supp. 3d 1, 2021 U.S. Dist. LEXIS 243756, 2021 WL 6062718, at *12 (D.D.C. Dec. 20, 2021), *reconsideration denied*, 2022 U.S. Dist. LEXIS 12488, 2022 WL 203456 (D.D.C. Jan. 24, 2022); *United States v. Mostofsky*, 579 F. Supp. 3d 9, 2021 U.S. Dist. LEXIS 243335, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021); *United States v. Bingert*, 2022 U.S. Dist. LEXIS 93790, 2022 WL 1659163, at *8-*9 (D.D.C.

4a

*Appendix A*

The Court is not persuaded, either by the government's arguments or those other decisions, that the statute is so clear that the rule of lenity is inapplicable. The Court therefore stands on its previous decision concerning the scope of § 1512(c)(2).

## II. Dismissal of the Indictment is not Premature

The government argues in the alternative that, even under the Court's interpretation of § 1512(c)(2), dismissal was premature because the Indictment satisfies Federal Rule of Criminal Procedure 7(c)(1) and is otherwise constitutional. *See* Mot. at 21-24. The government did not make this argument in its initial opposition to Miller's Motion to Dismiss. *See generally* Mem. in Opp., ECF No. 63-1. But even if the argument has not been forfeited— Miller, for his part, has not argued that the government forfeited this argument—it falls short.

Count Three of the Second Superseding Indictment states:

### COUNT THREE

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly

May 25, 2022), while others interpret "otherwise" to require a link between the subsections that is provided through the requirement that the illegal conduct be targeted at an "official proceeding," *see United States v. Montgomery*, 578 F. Supp. 3d 54, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *12 (D.D.C. Dec. 28, 2021); *United States v. Grider*, 585 F. Supp. 3d 21, 2022 U.S. Dist. LEXIS 23405, 2022 WL 392307, at *5-6 (D.D.C. Feb. 9, 2022).

5a

*Appendix A*

obstruct, influence, and impede an official
proceeding, that is, a proceeding before
Congress, specifically, Congress's certification
of the Electoral College vote as set out in the
Twelfth Amendment of the Constitution of the
United States and 3 U.S.C. §§ 15-18.

(**Obstruction of an Official Proceeding and
Aiding and Abetting**, in violation of Title 18,
United States Code, Sections 1512(c)(2) and 2)

Indictment at 2-3 (emphasis original). Count Three
contains no other allegations, is not preceded by a general
facts section, and does not cross-reference any other
Counts.

The government contends that the Indictment is
nonetheless sufficient, as it "echo[es] the operative
statutory text while also specifying the time and place
of the offense." Mot. at 21 (quoting *United States v.
Williamson*, 903 F.3d 124, 130, 438 U.S. App. D.C. 309
(D.C. Cir. 2018)). The government argues that Count
Three should be construed as encompassing both the
government's interpretation of the statute and the Court's.
Put differently, the government argues that because
Count Three echoes the statutory text, it is wholly
consistent with the Court's interpretation of the statute
(and, presumably, would be consistent with essentially
any interpretation).[2]

---

2. If the government's argument were correct, it is not apparent
why any Judge needed to address what conduct § 1512(c)(2) covers
at the motion-to-dismiss stage.

6a

*Appendix A*

Miller disagrees. He argues that an indictment must contain a "definite written statement of the essential facts constituting the offense charged." Def.'s Resp., ECF No. 80 at 22 (quoting Fed. R. Crim. P. 7(c)(1)) (emphasis omitted). Miller contends that nothing in Count Three (or in the Indictment more generally) alleges or even implies that he took some action with respect to a document, record, or other object, which is required under the Court's interpretation. *See id.* at 22-24; *Miller*, 2022 U.S. Dist. LEXIS 45696, 2022 WL 823070, at *15. Miller also notes that the Indictment does not include the facts essential to the charge, thus robbing him of his opportunity to prepare a proper defense. *See* Def.'s Resp. at 23.

The Court agrees with Miller.

An indictment must contain the essential facts constituting the charged offense. Chief Justice John Marshall explained long ago (albeit in the context of an admiralty proceeding to enforce a forfeiture judgment against a schooner and her cargo) that:

> It is not controverted that in all proceedings in the Courts of common law, either against the person or the thing for penalties or forfeitures, the allegation that the act charged was committed in violation of law, or of the provisions of a particular statute will not justify condemnation, unless, independent of this allegation, a case be stated which shows that the law has been violated. The reference to the statute may direct the attention of the Court,

7a

*Appendix A*

> and of the accused, to the particular statute by which the prosecution is to be sustained, but forms no part of the description of the offence. The importance of this principle to a fair administration of justice, to that certainty introduced and demanded by the free genius of our institutions in all prosecutions for offences against the laws, is too apparent to require elucidation, and the principle itself is too familiar not to suggest itself to every gentleman of the profession.

*The Hoppet*, 11 U.S. (7 Cranch) 389, 393, 3 L. Ed. 380 (1813); *see also* Joseph Story, *Commentaries on the Constitution of the United States* § 1779 (1833) ("[T]he indictment must charge the time, and place, and nature, and circumstances, of the offense, with clearness and certainty; so that the party may have full notice of the charge, and be able to make his defense with all reasonable knowledge and ability.").

   Courts soon applied this principle in criminal proceedings. *See* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 YALE L.J. 2446, 2500-01 (2016) (citing *The Hoppet* and noting that the "analogy between penal actions and criminal prosecutions may also have led judges to require more specificity in pleadings than standard civil practice would have demanded"); Note, *Indictment Sufficiency*, 70 COLUM. L. REV. 876, 884 (1970) (describing *The Hoppet* as the origin of the rule that a valid criminal indictment must include a "sufficient description of [the essential elements] to inform [a] defendant as to

8a

*Appendix A*

the nature and cause of his accusation"). As the Supreme Court stated in 1895, "the true test is, not whether [the criminal indictment] might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet." *Cochran v. United States*, 157 U.S. 286, 290, 15 S. Ct. 628, 39 L. Ed. 704 (1895); *see also United States v. Cruikshank*, 92 U.S. 542, 558, 23 L. Ed. 588 (1875) ("A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances."); *id.* at 559 ("[T]he indictment should state the particulars, to inform the court as well as the accused. It must be made to appear—that is to say, appear from the indictment, without going further—that the acts charged will, if proved, support a conviction for the offence alleged.").

This standard is still applicable today. As then-District Court Judge Jackson recently explained:

> It is axiomatic that "[a] crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances" if the charging document is to comport with the Constitution. *United States v. Cruikshank*, 92 U.S. 542, 558, 23 L. Ed. 588 (1875); *see also* U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation [against him.]"). To satisfy the protections

9a

*Appendix A*

that the Sixth Amendment guarantees, "*facts are to be stated, not conclusions of law alone.*" *Cruikshank*, 92 U.S. at 558 (emphasis added). In other words, "[t]he accusation must be legally sufficient, i.e., it must assert facts which in law amount to an offense and which, if proved, would establish prima facie the accused's commission of that offense." *United States v. Silverman*, 745 F.2d 1386, 1392 (11th Cir. 1984) (citation omitted).

   "The requirement that an indictment contain a few basic factual allegations accords defendants adequate notice of the charges against them and assures them that their prosecution will proceed on the basis of facts presented to the grand jury." *United States v. Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979). "The . . . generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." [*United States v.*] *Conlon*, 628 F.2d [150,] 155, 202 U.S. App. D.C. 150 [(D.C. Cir. 1980)]. Furthermore, and importantly for present purposes, "[i]t is an elementary principle of criminal pleading[ ] that where the definition of an offen[s]e . . . includes generic terms, it is not sufficient that the indictment shall charge the offen[s]e in the same generic terms as in the definition; but it must state the species[ ]—it

10a

*Appendix A*

must descend to particulars." *United States v. Thomas*, 444 F.2d 919, 921, 144 U.S. App. D.C. 44 (D.C. Cir. 1971) (first alteration in original) (quoting *Cruikshank*, 92 U.S. at 558). Thus, an indictment that mirrors the exact language of a criminal statute may nevertheless be dismissed as constitutionally deficient if it is "not framed to apprise the defendant 'with reasonable certainty[ ] of the nature of the accusation against him[.]'" [*United States v.*] *Nance*, 533 F.2d [699,] 701, 174 U.S. App. D.C. 472 [(D.C. Cir. 1976)] (quoting [*United States v.*] *Simmons*, 96 U.S. [360,] 362, 24 L. Ed. 819 [(1877)]).

*United States v. Hillie*, 227 F. Supp. 3d 57, 71-72 (D.D.C. 2017) (Jackson, K.B., J.) (noncitation alterations in original).

To be sure, in certain circumstances, an indictment that "echoes the operative statutory text while also specifying the time and place of the offense" can be sufficient. *Williamson*, 903 F.3d at 130; *United States v. Resendiz-Ponce*, 549 U.S. 102, 109, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007); *United States v. Verrusio*, 762 F.3d 1, 13, 412 U.S. App. D.C. 1 (D.C. Cir. 2014). But those cases involve criminal statutes that are sufficiently precise such that merely echoing the statutory language in the indictment provides enough specificity to apprise a reasonable defendant of his allegedly unlawful conduct. *See, e.g.*, *Williamson*, 903 F.3d at 130-31 ("[B]y parroting the statutory language and specifying the time and place of the offense and the identity of the threatened officer,

11a

*Appendix A*

the indictment adequately informed Williamson about the charge against him [under 18 U.S.C. § 115(a)(1)] so that he could prepare his defense and protect his double-jeopardy rights."); *Resendiz-Ponce*, 549 U.S. at 107-08 ("[I]t was enough for the indictment in this case to point to the relevant criminal statute [8 U.S.C. § 1326(a)] and allege that '[o]n or about June 1, 2003,' respondent 'attempted to enter the United States of America at or near San Luis in the District of Arizona.'"); *see also Verrusio*, 762 F.3d at 13-14 (approving a much more detailed indictment than mere parroting).

In some circumstances, then, merely echoing the words of a statute and adding the time and location of the alleged offense may be enough. But when a statute is so broad and general that its terms, without more, fail to inform a reasonable person of the essential conduct at issue, merely echoing that language is *not* enough. As the Supreme Court has stated, "[i]*t is an elementary principle of criminal pleading, that where the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars*." *Cruikshank*, 92 U.S. at 558 (emphasis added). In such cases, "it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll*, 105 U.S. 611, 612, 26 L. Ed. 1135 (1881); *see also Hess*, 124 U.S. at 487 ("Undoubtedly, the language of the statute may be

12a

*Appendix A*

used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."); *Williamson*, 903 F.3d at 131 ("It is true that, while parroting the statutory language is 'often sufficient,' that is not invariably so."). The government seems to realize that parroting the statute will not always suffice. Indeed, the Indictment includes allegations laying out the "official proceeding" at issue here. *See* Indictment at 2-3 (alleging that Miller disrupted "an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18").

To be sure, "neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every *means* by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124, 181 U.S. App. D.C. 254 (D.C. Cir. 1976) (emphasis added). And the Federal Rules "were designed to eliminate technicalities in criminal pleading and are to be construed to secure simplicity in procedure." *United States v. Debrow*, 346 U.S. 374, 376, 74 S. Ct. 113, 98 L. Ed. 92 (1953). But an indictment still must include allegations of fact sufficient to make a prima facie case of criminal conduct. That rule "retain[s its] full vitality under modern concepts of pleading, and specifically under Rule 7(c) of the Federal Rules of Criminal Procedure." *Russell*, 369 U.S. at 763.

13a

*Appendix A*

In the specific context of this statute, under the government's interpretation, just about any *actus reus* could satisfy the statute. *See, e.g.*, Mot. at 10-11; *see also Caldwell*, 2021 U.S. Dist. LEXIS 243756, 2021 WL 6062718, at *13 (noting that "a person outside the Capitol building protesting legislation while it is under consideration by a congressional committee," or a "citizen who emails her congresswoman to urge her to vote against a judicial nominee" could fall under a broad reading of the statute, but stating without explanation that "no one would seriously contend that such [ ] act[s] violate[ ] section 1512(c)(2)"). Indeed, absent any limiting context, the words "obstruct, influence, and impede" provide essentially no limit on what criminal conduct might be at issue. *See Miller*, 2022 U.S. Dist. LEXIS 45696, 2022 WL 823070, at *9; *Sandlin*, 2021 U.S. Dist. LEXIS 237131, 2021 WL 5865006, at *5; *see also Caldwell*, 2021 U.S. Dist. LEXIS 243756, 2021 WL 6062718, at *13 (explaining that "[t]he terms 'obstruct,' 'impede,' and especially 'influence,' unless meaningfully limited, sweep in wholly innocent and protected First Amendment conduct."). This is true in part because those verbs refer to the *effect* that an action has, not to the *act* itself. *See Sandlin*, 2021 U.S. Dist. LEXIS 237131, 2021 WL 5865006, at *5. Because many actions (including some constitutionally protected ones) could have the natural and probable effect of at least influencing an official proceeding, those words, without more, provide a defendant little to no guidance as to what conduct is being charged.[3]

---

3. Other Judges in the District have concluded that the word "corruptly" limits the scope of § 1512(c)(2). *See, e.g., Sandlin*, 2021 U.S. Dist. LEXIS 237131, 2021 WL 5865006, at *13; Final Jury

14a

*Appendix A*

As for the Indictment here, it states that Miller "attempted to, and did, corruptly obstruct, influence,

---

Instructions, *United States v. Reffitt*, No. 21-cr-32, ECF No. 119, at 25 ("To act 'corruptly,' the defendant must use unlawful means or act with an unlawful purpose, or both."); *Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *21 ("The predominant view among the courts of appeals is that the 'corruptly' standard requires at least an 'improper purpose' and an 'intent to obstruct.'"). But this limitation goes to the *mens rea* required by the statute; it does not limit the types of conduct that are made criminal. *But see* 18 U.S.C. § 1515(b) (defining "corruptly" in § 1505 as "acting with an improper purpose" but specifically "including" only acts with an evidentiary nexus); *United States v. Poindexter*, 951 F.2d 369, 385, 292 U.S. App. D.C. 389 (D.C. Cir. 1991) (interpreting "corruptly" in a transitive sense, requiring acts directed towards others). And much like the different opinions on the scope of the statute, *see supra note* 1, while all Judges to have considered the issue have concluded that the statute's use of the term "corruptly" does not render it unconstitutionally vague, those decisions have not landed on a consistent approach. For example, some have suggested that "corruptly" means acting "voluntarily and intentionally to bring about an unlawful result or a lawful result by some unlawful method, with hope or expectation of . . . [a] benefit to oneself or a benefit to another person," *Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591 at *22 n.5 (quoting *Aguilar*, 515 U.S. at 616-17 (Scalia, J., concurring in part and dissenting in part)), while others have suggested it means, at least, acting with "consciousness of wrongdoing." *Bingert*, 2022 U.S. Dist. LEXIS 93790, 2022 WL 1659163, at *6 (quoting *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005)).

In any event, the government has not argued that "corruptly" meaningfully clarifies or limits the conduct charged in the Indictment here. Although the Court does not now interpret "corruptly" as used in § 1512(c), the Court concludes that the common meanings of "corruptly" are sufficiently capacious so as not to limit or clarify the actus reus charged in the Indictment.

15a

*Appendix A*

and impede an official proceeding." Indictment at 2. The charge provides no further detail as to what conduct by Miller the government (or the grand jury, for that matter) considers the *actus reus*. But that act is an essential element of the crime.[4]

The government responds that Count Three is sufficient because it necessarily encompasses the Court's interpretation of § 1512(c)(2). *See* Mot. at 21-24. The Court disagrees. Absent any additional context or specificity, nothing in Count Three informs Miller of what actions he is alleged to have taken with respect to some document, record, or other object. *See Miller*, 2022 U.S. Dist. LEXIS 45696, 2022 WL 823070, at *15. And looking to the rest of the Indictment, and assuming that Count Three implicitly incorporates its other charges, the government has pointed to no action alleged in the Indictment's four corners that has a reasonable nexus with a document,

---

4. Note that the Indictment would be insufficient even under the government's reading of the statute. Indeed, it is perhaps *more* problematic because an even broader set of conduct can be criminal under § 1512(c)(2) on the government's view, thereby providing even less notice to the defendant through language that merely summarizes the statute.

Indictments may cross-reference other counts. Such cross-references could provide detail that mere parroting of general words of a statute do not. For example, under the government's interpretation of § 1512(c)(2), a charge of an indictment under that count could incorporate the factual details provided by other charges. But here there is no such explicit cross-reference, and the Court need not determine whether a charge lacking specificity implicitly cross-references other conduct in the indictment because nothing in this Indictment provides a document nexus.

16a

*Appendix A*

record, or other object. The Court cannot presume that the grand jury passed judgment on this essential element of the offense. *See United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 109-10 (D.D.C. 2016).

The government offers a fallback argument, contending that the Indictment's reference to a specific official proceeding, which itself involved documents, cures the insufficiency. *See* Reply at 10-11. Again, the Court disagrees. The Indictment's reference to the certification of the Electoral College vote is only a reference to the official proceeding in question. It sheds no light on the *actus reus* that Miller is alleged to have taken.

The government also contends that the preferred remedy to a vague indictment is a bill of particulars, not dismissal. *See* Reply at 11-12; Transcript of Hearing of May 4, 2022 in *United States v. Lang*, No. 21-cr-53; *see also* Minute Order of November 19, 2021, *United States v. Reffitt*, No. 21-cr-32 (D.D.C.) (ordering a bill of particulars instead of granting a motion to dismiss when the government advanced multiple theories about how the Defendant violated § 1512(c)(2), none of which were described in the Indictment). But "courts have long held that, while a valid indictment can be clarified through a bill of particulars, *an invalid indictment cannot be saved by one*." *Hillie*, 227 F. Supp. 3d at 81 (emphasis modified); *see also Conlon*, 628 F.2d at 156 ("[I]t is settled that a bill of particulars and a fortiori oral argument cannot cure a defective indictment."); *Nance*, 533 F.2d at 701-02 (same); *Thomas*, 444 F.2d at 922-23 (same). As then-District Judge Jackson explained:

17a

*Appendix A*

A subsequent statement by the government in the form of a bill of particulars does not guarantee that the formal charges brought against the defendant adhere to the facts that the grand jury considered. *See Nance*, 533 F.2d at 701 (finding that a bill of particulars did not remedy an indictment that lacked "any allegation whatsoever" on a key element of the offense, because merely reciting the words of the statute gave the government "a free hand to insert the vital part of the indictment without reference to the grand jury"). And "to permit the omission [of a material fact] to be cured by a bill of particulars would be to allow the grand jury to indict with one crime in mind and to allow the U.S. Attorney to prosecute by producing evidence of a different crime"; which would, in essence, "usurp the function of the grand jury . . . and, in many cases, would violate due process by failing to give the accused fair notice of the charge he must meet." *Thomas*, 444 F.2d at 922-23. Therefore, even if the government's subsequent statement might reduce the future risk of double jeopardy, *see, e.g.*, [*United States v.*] *Sanford, Ltd.*, 859 F.Supp.2d [102,] 124 [(D.D.C. 2012)], it cannot "cure" an indictment that fails to provide Defendant with present notice of the charges against him or that potentially thwarts the role of the grand jury in bringing those charges in the first place, *see Russell*, 369 U.S. at 770 (finding that a bill of particulars cannot cure

18a

*Appendix A*

an imprecise and fatally defective indictment); *see also Gaither*[ *v. United States*], 413 F.2d [1061,] 1067, 134 U.S. App. D.C. 154 [(D.C. Cir. 1969)] ("The bill of particulars fully serves the functions of apprising the accused of the charges and protecting him against future jeopardy, but it does not preserve his right to be tried on a charge found by a grand jury.").

*Hillie*, 227 F. Supp. 3d at 81 (Jackson, K.B., J.) (noncitation alterations in original).

In sum, Count Three of the Second Superseding Indictment is far too sparse under any proposed reading of the statute. Miller has a constitutional "right . . . to be informed of the nature and cause of the accusation" against him. U.S. Const. Amend. VI.; *see also* Fed. R. Crim. P. 7(c) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"). And allowing the government to correct that violation with a bill of particulars would simply spawn another constitutional problem, because "[n]o person shall be held to answer for a [felony], unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V.[5]

---

5. The Court observes that some of the January 6 indictments include lengthy fact sections that may even include allegations that provide both an *actus reus* and an adequate nexus to a document, record, or other object. *See, e.g.*, *Caldwell I*, 2021 U.S. Dist. LEXIS 243756, 2021 WL 6062718, at *13 (D.D.C. Dec. 20, 2021) (listing detailed factual allegations in the Indictment). And others specify the alleged *actus reus* conduct in the count charging a violation of

19a

*Appendix A*

\* \* \*

For the forgoing reasons, the Court **DENIES** the government's Motion to Reconsider.

DATE: May 27, 2022

/s/ Carl J. Nichols
CARL J. NICHOLS
United States District Judge

§ 1512(c)(2). *See, e.g.*, *United States v. Robertson*, 2022 U.S. Dist. LEXIS 62726, 2022 WL 969546, at *3 (D.D.C. Feb. 25, 2022) (alleging that the defendants obstructed, influenced, and impeded an official proceeding "by entering and remaining in the United States Capitol without authority and participating in disruptive behavior"). The Court does not, of course, opine on the sufficiency of such indictments, but does note that the government has declined to pursue, or has failed to secure, such an indictment in this case.

20a

**APPENDIX B — MEMORANDUM OPINION
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA,
FILED MARCH 7, 2022**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Criminal Action No. 1:21-cr-00119 (CJN)

UNITED STATES OF AMERICA,

v.

GARRET MILLER,

*Defendant.*

**MEMORANDUM OPINION**

On January 6, 2021, as a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College, thousands of people, many of whom had marched to the Capitol following a rally at which then-President Donald Trump spoke, gathered outside. ECF No. 1-1; *United States v. Montgomery*, No. 21-cr-46, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *2 (D.D.C. 2021). Things soon turned violent. *See* ECF No. 1-1. By approximately 2:00 p.m., rioters had broken through the protective lines of the Capitol Police, assaulting officers and breaking windows in the process. *Id.* The violence escalated, often cheered on by certain members of the mob. *Id.* And the rioters soon stormed through

21a

*Appendix B*

the halls of Congress, forcing members of the House of Representatives, the Senate, and the Vice President to flee. *Id.* "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th 10, 15, 455 U.S. App. D.C. 49 (D.C. Cir. 2021).

The government alleges that Defendant Garret Miller was an active participant in these events. On May 12, 2021, a grand jury returned a second superseding indictment that charges Miller with twelve different criminal offenses, several of which are felonies. The government asserts that Miller predicted the likelihood of violence on January 6; pushed past officers to gain entrance to the Capitol; posted videos and pictures on social media from inside; and made various self-incriminating statements in the days thereafter. *See infra* at 3-4. The government has also proffered evidence that Miller made several threats on social media following January 6, including to Representative Alexandria Ocasio-Cortez and a Capitol Police Officer. *See id.* at 4-5.

Miller has filed several pretrial motions. He moved to revoke the detention order that had been entered by the District Court for the Northern District of Texas. ECF No. 14. The Court denied that request on the ground that no conditions of release could reasonably ensure the safety of the community were Miller to be released before trial. *See* Minute Entry of April 1, 2021. Miller also moved for discovery and for an evidentiary hearing regarding what he claimed was the government's selective prosecution of him as compared to the protestors in Portland, Oregon,

22a

*Appendix B*

ECF No. 32, 33. The Court denied those motions. ECF No. 67.

Still pending is Miller's Motion to Dismiss Count Three of the Superseding Indictment ("Mot."), ECF No. 34, in which Miller seeks to dismiss one of the twelve counts in the Second Superseding Indictment. For the reasons discussed below, the Court agrees with Miller that his conduct does not fit within the scope of the statute he is charged with violating, 18 U.S.C. § 1512(c)(2).

## BACKGROUND

### A. January 6, 2021[1]

At approximately 1:00 p.m. on January 6, 2021, a joint session of Congress convened in the U.S. Capitol. ECF No. 1-1 at 1. Its purpose was to certify the vote count of the Electoral College, as required by the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15. Then-Vice President Michael Pence, as President of the Senate, presided over the joint session. ECF No. 1-1 at 1.

The proceedings started relatively smoothly. After about thirty minutes, the Senate returned to its chambers so the two houses could separately consider an objection from the State of Arizona. *Montgomery*, 2021 U.S. Dist.

---

1. The facts in this subsection are meant for background only. The Court's analysis of Miller's Motion to Dismiss is limited to the Indictment alone. *See United States v. Akinyoyenu*, 199 F. Supp. 3d. 106, 109-10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149, 417 U.S. App. D.C. 401 (D.C. Cir. 2015)).

23a

*Appendix B*

LEXIS 246750, 2021 WL 6134591, at *2. During this period, the mob mentioned above—having marched to the Capitol following a rally at which then-President Donald Trump spoke, *id.*—started to form outside, ECF No. 1-1 at 1.

The Capitol is a secure building, guarded at all times by the United States Capitol Police. *Id.* But on January 6, 2021, the Capitol Police had taken extra precautions, erecting temporary and permanent barriers around the building's perimeter. *Id.* The Capitol Police also closed the entire exterior plaza of the building to the public. *Id.*

Those extra precautions were not enough. The mob soon turned violent. *See id.* Rioters broke through the protective lines of the Capitol Police, assaulted officers, and shattered windows in the process. *Id.* Members of the House of Representatives, the Senate, and the Vice President fled as rioters mobbed the halls. *Id.* All the while, looting and destruction continued, *see id.*, producing devastating results, *see Thompson*, 20 F.4th at 15-16.

The government alleges that Miller was part of this violent mob, pushing past officers to gain entrance to the building. ECF No. 1-1 at 2, 5. The government alleges that he foresaw the violence coming, as he posted to Facebook four days before that he was "about to drive across the country for this [T]rump shit. On Monday . . . Some crazy shit going to happen this week. Dollar might collapse . . . civil war could start . . . not sure what to do in DC."

24a

*Appendix B*

*Id.* at 2.[2] It further alleges that Miller posted videos to his Twitter account from the Capitol rotunda, showing rioters waving flags of support for then-President Trump. *Id.* Miller allegedly captioned the video as being "From inside [C]ongress." *Id.* And he is claimed to have posted a selfie of himself inside the Capitol. When a commentor wrote "bro you got in?! Nice!" Miller allegedly replied, "just wanted to incriminate myself a little lol." *Id.* at 4.

The government contends that Miller made several additional incriminating social-media posts in the days following the attack on January 6. When individuals on Twitter claimed that those who stormed the Capitol were "paid infiltrators" or "antifa," Miller is alleged to have consistently corrected them: "Nah we stormed it. We where [sic] gentle. We where [sic] unarmed. We knew what had to be done." *Id.* at 6. And when others asked him if he was in the building, he allegedly responded, "Yah . . . we charged . . . We where [sic] going in . . . No matter what . . . Decided before the [T]rump speech . . . I charged the back gates myself with an anti[-]masker." *Id.*

The government also alleges that Miller made several threats on social media following January 6. Regarding Representative Alexandria Ocasio-Cortez, he tweeted, "Assassinate AOC." *Id.* at 8. And when discussing the shooting of a woman by a Capitol Police Officer during the riot, Miller is alleged to have written, "We going to get a hold [sic] of [the officer] and hug his neck with

---

2.  It is unclear whether the ellipses are Miller's own or added by the government.

25a

*Appendix B*

a nice rope[.]" *Id.* at 9. When the person with whom he was chatting responded, "Didn't you say you were a Christian or some lie?," Miller is alleged to have typed, "Justice . . . Not murder . . . Read the commandment . . . there[']s a difference." *Id.* He also is alleged to have made several additional comments about "huntin[g]" this police officer. *See id.* And he is alleged to have later written in a Facebook chat, "Happy to make death threats so I been just off the rails tonight lol." *Id.*

## B.  Miller's Indictment

For purposes of Miller's Motion to Dismiss Count III, the Court must assume as true the allegations contained in the Indictment—but may rely only on those allegations. *United States v. Akinyoyenu*, 199 F. Supp. 3d. 106, 109-10 (D.D.C. 2016) (citing *United States v. Ballestas*, 795 F.3d 138, 149, 417 U.S. App. D.C. 401 (D.C. Cir. 2015)). The Second Superseding Indictment, and particularly Count Three, is quite sparse. It provides:

### COUNT THREE

On or about January 6, 2021, within the District of Columbia and elsewhere, **GARRET MILLER**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

26a

*Appendix B*

Second Superseding Indictment ("Indictment"), ECF No. 61 at 2-3.[3] The Indictment further specifies that this is an alleged violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2, what the government titles "Obstruction of an Official Proceeding and Aiding and Abetting" the same. *Id.* at 3. The Indictment provides no other facts in support of this Count.

## C.   Miller's Motion to Dismiss

Miller moves to dismiss only Count Three. *See generally* Mot. The statute he is charged with violating, 18 U.S.C. § 1512(c)(2), provides:

> **(c)** Whoever corruptly—
>
> > **(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > **(2)** otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

---

3.  Miller moved to dismiss Count Three of the First Superseding Indictment, ECF No. 30, but the language of Count Three is identical in the Second Superseding Indictment. His original Motion is thus not moot. *See United States v. Goff*, 187 Fed. App'x 486, 491 (6th Cir. 2006).

27a

*Appendix B*

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).[4] Miller presents various objections to Count III, either in his own briefs or by adopting arguments made by other January 6 defendants.

First, Miller claims that Congress's certification of the 2020 presidential election was not an "official proceeding." Mot. at 8-11. He argues that because the certification was not judicial in nature, it was not a "proceeding" at all. Miller marshals several definitions of "proceeding" to support this position. *See id.*

Second, Miller argues that § 1512(c)(2) must be read as a catchall to the narrowly focused subsection preceding it, § 1512(c)(1)—not as an untethered, wholly unrelated crime. *See* Miller's Second Supplemental Brief ("Sec. Supp."), ECF No. 59 at 3-7. In Miller's view, since § 1512(c)(1) is narrowly tailored to evidence spoliation, and "specific examples enumerated prior to [a] residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause," *id.* at 4, § 1512(c)(2) must be limited to "conduct [that] undermined the official proceeding's truth-finding

---

4. Count Three also charges a violation of 18 U.S.C. § 2. That section states that anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). In the context of Count III, a violation of § 2 is thus dependent on some violation of § 1512(c)(2)—the only offense against the United States charged in Count III.

28a

*Appendix B*

function through actions impairing the integrity and availability of evidence," *id.* at 7 (quotations omitted).

Finally, Miller argues that the mens rea requirement of § 1512(c)(2)—that the criminal act be committed "corruptly"—lacks a limiting principle, and is thus unconstitutionally vague as applied to him. Sec. Supp. at 7-16. "Corruptly," he notes, is not defined in the statute, and relying on *United States v. Poindexter*, 951 F.2d 369, 292 U.S. App. D.C. 389 (D.C. Cir. 1991), he argues that it is unconstitutionally vague here. Sec. Supp. at 9-14.

The government contends that Miller's alleged conduct fits comfortably within § 1512(c)(2). Relying on the statute's definition of "official proceeding" as including "a proceeding before Congress," 18 U.S.C. § 1515(a)(1)(B), the government argues that the certification of the electoral vote was plainly a proceeding before Congress. *See generally* Opp. to Def.'s Mot. to Dismiss ("Resp."), ECF No. 35. As to the scope of § 1512(c)(2), the government argues that the statute "comprehensively prohibit[s] conduct that intentionally and wrongfully obstructs official proceedings," and does not require any connection to evidence or documents. Gov't Resp. to Defs.' Joint Supp. Br. ("*Montgomery* Br."), ECF No. 63-1 at 6.[5] And with respect to Miller's vagueness argument, the government contends that, as used here, "corruptly" is not unconstitutionally vague—and indeed that the Court of Appeals and Supreme Court have rejected vagueness

---

5. In response to Miller's Second Supplemental Brief, the government lodged in this case the brief it filed in *United States v. Montgomery*, No. 21-cr-46.

29a

*Appendix B*

challenges to convictions under statutes requiring that a defendant acted "corruptly." *Id.* at 17-20.

For each contention, Miller notes that the Court is under an obligation to exercise restraint in construing criminal laws and to apply the rule of lenity should genuine ambiguity persist. Mot. at 7 & n.1. The government does not challenge either of these interpretive principles. *See generally Montgomery* Br.

## LEGAL STANDARDS

### A. Motions to dismiss generally

Before trial, a criminal defendant may move to dismiss a charge based on a "defect in the indictment." Fed R. Crim. P. 12(b)(3)(B). "The operative question is whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged." *Akinyoyenu*, 199 F. Supp. 3d at 109. The Court thus bases its analysis only on the language charged in the Indictment and the language of the statute alleged to have been violated. *See id.* at 109-10 (collecting citations).

### B. The Court must exercise restraint when assessing the reach of criminal statutes

Because Miller challenges the scope of a federal criminal statute and its application to his alleged conduct, additional interpretive rules apply. First, federal courts have "traditionally exercised restraint in assessing the

30a

*Appendix B*

reach of a federal criminal statute." *United States v. Aguilar*, 515 U.S. 593, 600, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995). The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Id.* at 600 (citations omitted); *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1223-28, 200 L. Ed. 2d 549 (2018) (Gorsuch, J., concurring in part and concurring in judgment). This "prudent rule of construction" continues with force today. *Dowling v. United States*, 473 U.S. 207, 214, 105 S. Ct. 3127, 87 L. Ed. 2d 152 (1985); *see Marinello v. United States*, 138 S. Ct. 1101, 1108, 200 L. Ed. 2d 356 (2018) (endorsing the rule).

Running parallel to this principle is the rule of lenity. "[T]he rule of lenity is venerable," *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring), having arisen to mitigate draconian sentences in England and having been firmly established in English law by the time of Blackstone, *id.* at 473. "[I]t took root in our law soon thereafter." *Id.*

"Under the rule of lenity, courts construe penal laws strictly and resolve ambiguities in favor of the defendant," *id.*, so long as doing so would not "conflict with the implied or expressed intent of Congress," *Liparota v. United States*, 471 U.S. 419, 427, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985). Under current doctrine, the rule of lenity applies to instances of "grievous" ambiguity, *see Sohular v. United States*, 140 S. Ct. 779, 788, 206 L.

31a

*Appendix B*

Ed. 2d 81 (2020) (Kavanaugh, J., concurring) (collecting citations), a construction that is arguably in tension with the rule's historical origins, *see* 1 William Blackstone, *Commentaries* *88 ("Penal statutes must be construed strictly."). *See also Wooden v. United States*, U.S. , 142 S. Ct. 1063 (2022) (Gorsuch, J., concurring in judgment) (slip op. at 9-12); *but see id.* (Kavanaugh, J., concurring) 2022 U.S. LEXIS 1421, (slip op. at 1-4).

## I.   CONGRESSIONAL CERTIFICATION OF ELECTORAL COLLEGE RESULTS IS AN "OFFICIAL PROCEEDING"

Miller's first argument is that the Congressional certification of the Electoral College was not an "official proceeding." Mot. at 8-11. But this argument essentially ignores that, as used in § 1512, "official proceeding" is a defined term, and its definition covers the Congressional certification of Electoral College results.

18 U.S.C. § 1515(a)(1) provides that, "[a]s used in section[ ] 1512 . . . *the term 'official proceeding' means . . . a proceeding before the Congress.*" 18 U.S.C. § 1515(a)(1)(B) (emphasis added). A "proceeding" is "a particular thing done: affair, transaction, negotiation," as in "an illegal proceeding" or "business proceedings." *Proceeding*, def. f, *Merriam-Webster's Unabridged Dictionary* (2021). The certification of the Electoral College is, of course, "a particular thing done" before Congress.

Miller argues that the "legal," as opposed to "lay," understanding of "proceeding" should control here. Mot. at 9; *see also United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). But Black's Law Dictionary—the

32a

*Appendix B*

leading authority on "legal" uses of words—defines a "proceeding" as "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, def. 4, Black's Law Dictionary (11th ed. 2019). The certification of the Electoral College results by Congress is "business conducted by a[n] . . . official body." *Id.* Indeed, it is business required by both the Twelfth Amendment and the Electoral Count Act. *See* U.S. Const. Amend. XII; 3 U.S.C. § 15.

To be sure, several definitions of the word "proceeding"—whether "lay" or "legal" definitions—focus on judicial proceedings. *See, e.g., Proceeding*, def. 1, Black's Law Dictionary (11th ed. 2019) ("The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment"). But context matters, and it makes little if any sense, in the context here, to read "a proceeding before Congress" as invoking only the judicial sense of the word "proceeding." After all, the only proceedings of even a quasi-judicial nature before Congress are impeachment proceedings, and Miller has offered no reason to think Congress intended such a narrow definition here.

\* \* \*

Miller's Indictment thus properly alleges an involvement with an official proceeding—"that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." Indictment at 2-3. On that ground, at least, his Motion to Dismiss fails.

33a

*Appendix B*

## II. Miller's Alleged Conduct Does Not Fit Within The Scope of Section 1512(c)(2)

Miller's second challenge is broader: he argues that § 1512(c)(2) does not make criminal his alleged actions on January 6. In order to assess the merits of this challenge, the Court must determine what conduct § 1512(c)(2) prohibits and whether Miller's alleged actions fall within that prohibition. Applying the traditional tools of statutory interpretation—text, structure, and the development of the statute over time—the Court concludes that three readings of the statute are possible, and two are plausible. This is therefore a circumstance in which the Court must "exercise[ ] restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and "resolve ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427).

### A. The text of § 1512(c) supports three possible readings of the statute

The Court begins, as it must, with the text. Recall what § 1512(c) proscribes:

> **(c)** Whoever corruptly—
>
> **(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or

34a

*Appendix B*

> **(2)** *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so,

> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added). Miller is charged with violating only subsection (2).

Reading § 1512(c)(2) alone is linguistically awkward. That is because of the adverbial use of the word "otherwise," such that § 1512(c)(2), on its own, makes criminal "whoever corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." The parties are therefore in agreement that the meaning of "otherwise" is critical to determining what § 1512(c)(2) covers. They differ, however, over what that meaning is, and whether or how the word "otherwise" ties § 1512(c)(2) to the prior subsection—§ 1512(c)(1).

*Otherwise as a clean break between subsections.* When § 1512(c) became law, "otherwise" had three different definitions that are plausible in this context: "in a different way or manner: differently"; "in different circumstances: under other conditions"; and "in other respects." *Otherwise, Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002). Relying on the first definition—"in a different way or manner"—and the breadth of the terms in § 1512(c)(2), the government suggests that "otherwise" essentially serves as a clean break between subsections (c)(1) and (2), and thus the only question is whether Miller "corruptly

35a

*Appendix B*

. . . obstruct[ed], influence[d], or impede[d] any official proceeding, or attempt[ed] to do so." Under this reading, there would be no relationship between subsections (c)(1) and (c)(2) at all.

There are a number of problems with this interpretation. *First*, it ignores that "otherwise" has several different (though related) definitions, each of which implies a relationship to something else—here, subsection (c)(1).

*Second*, and more important, this interpretation does not give meaning to the word "otherwise." When possible, of course, the Court must give effect to every word in a statute. *Setser v. United States*, 566 U.S. 231, 239, 132 S. Ct. 1463, 182 L. Ed. 2d 455 (2012). But if § 1512(c)(2) is read as wholly untethered to § 1512(c)(1), then "otherwise" would be pure surplusage. In other words, under this reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word "otherwise."

*Third*, reading "otherwise" in this way is inconsistent with *Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). There, the Supreme Court considered whether drunk driving was a "violent felony" under the Armed Career Criminal Act. The ACCA defined a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a risk of physical injury to another."

36a

*Appendix B*

*Begay*, 553 U.S. at 139-40 (quoting 18 U.S.C. § 924(e)(2)(B)(ii) (2000)) (emphasis added). Crucial to the Court's analysis was thus what "otherwise" meant.

Both the five-Justice majority and Justice Scalia concluded that the ACCA's use of the word "otherwise" in some way tethered the text preceding the word to the text following it; the majority and Justice Scalia differed only in *how* it did so. The majority opinion concluded that the text preceding "otherwise" influenced the meaning of the text that followed: it "limit[ed] the scope of the clause to crimes that are *similar to the examples themselves*." *Begay*, 553 U.S. at 143 (emphasis added). The Court thus held that "driving under the influence" fell outside of the ACCA's "violent felony" definition because it was not like burglary, arson, or extortion. *Id.* at 142.

As for Justice Scalia, he agreed with the majority that "otherwise" tethered the text preceding it to the text following, but he disagreed regarding how they related. In Justice Scalia's view, "by using the word 'otherwise' the writer draws a substantive connection between two sets only on one specific dimension—*i.e.*, whatever *follows* 'otherwise.'" *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis added). Thus, in Justice Scalia's view, the text before "otherwise" did not limit the text that follows it.[6]

Justice Alito dissented. In the dissent's view, the "offenses falling within the residual clause must be similar

---

6.  Justice Scalia had previously advanced this position in his dissent in an earlier ACCA case. *See James v. United States*, 550 U.S. 192, 218, 127 S. Ct. 1586, 167 L. Ed. 2d 532 (2007) (Scalia, J., dissenting).

37a

*Appendix B*

to the named offenses in one respect only: They must 'otherwise'—which is to say, 'in a different manner'—'involv[e] conduct that presents a serious potential risk of physical injury to another.'" *Id.* at 159 (Alito, J., dissenting) (citations omitted) (modification in original). As a result, Justice Alito concluded, the only question was whether drunk driving "involv[es] conduct that presents a risk of physical injury to another"—and, Justice Alito concluded, it does. *Id.* This position, of course, is very similar to the interpretation suggested by the government here. *See Montgomery* Br. at 7-8. But it garnered only three votes.

The Court recognizes that certain courts of appeals have adopted this clean-break reading of "otherwise" in § 1512(c)(2), but the Court is not persuaded that those decisions are correct. Take *United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015), for example. That decision's textual analysis is curt, and only one paragraph discusses the statutory language:

> While we acknowledge that § 1512(c)(1) is limited to obstruction relating to "a record, document, or other object," § 1512(c)(2) is not so limited. Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ("otherwise") manner compared to § 1512(c)(1) if the defendant "obstructs, influences, or impedes any official proceeding" without regard to whether the action relates to documents or records. *See* Webster's New World College Dictionary 1021 (4th ed. 2007) (defining "otherwise" as "in another manner; differently"). Thus,

38a

*Appendix B*

§ 1512(c)(2) "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (citation omitted) (internal quotation marks omitted); *see also Aguilar*, 515 U.S. at 598 (interpreting similar language in 18 U.S.C. § 1503(a) as a "catchall" omnibus clause that is "far more general in scope than the earlier clauses of the statute").

*Id.* at 446-47.

The decision in *Petruk* does not mention, let alone discuss, the Supreme Court's decision in *Begay*. Moreover, it relies on an incorrect reading of the Court's decision in *Aguilar*. In particular, as reflected in the quotation above, *Petruk* described *Aguilar* as having "interpret[ed]" a clause in 18 U.S.C. § 1503 as a "'catchall' omnibus clause that 'is far more general in scope than the earlier clauses of the statute.'" *Id.* (quoting *Aguilar*, 515 U.S. at 598). But that language from *Aguilar* came at the *beginning* of the Supreme Court's opinion, when the Court was merely explaining how "[t]he statute is structured." *Aguilar*, 515 U.S. at 598. The actual opinion in *Aguilar* went on to *reject* such a broad reading of the "omnibus clause," instead adopting "decisions of Courts of Appeals [that] have . . . place[d] metes and bounds on the very broad language of the catchall provision." *Id.* at 599-600. And *Aguilar* explained the Court's traditional restraint in assessing

39a

*Appendix B*

the reach of criminal statutes as support for this holding. *See id.* at 600.[7]

*Subsection (c)(1) provides examples of conduct that violates subsection (c)(2).* The government also presents an alternative reading of the statute: that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2). On this interpretation, the word "otherwise" in § 1512(c)(2) does tether the two subsections together, with the text preceding the word—subsection (c)(1)—providing examples that fit within (c)(2)'s broader scope. Under this reading, a common element in, or link between, the subsections is that the unlawful conduct must relate to an "official proceeding." *See Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591 at *12.

This interpretation solves several of the problems posed by the interpretation discussed above. It acknowledges that "[b]y using the word 'otherwise,' Congress indicated a substantive connection between" the text preceding and the text following the word. *United States v. Begay*, 470

---

[7.] The Seventh Circuit's decision in *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), similarly misconstrued *Aguilar. See id.* at 809 (relying on *Aguilar* as having "interpret[ed] similar language in 18 U.S.C. § 1503 as an 'Omnibus Clause . . . prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice' and concluding that the language is 'general in scope.'") And, in any event, the scope of § 1512(c)(2) was not before the Seventh Circuit in *Burge*; the question there was whether an official proceeding needed to be *pending* for a defendant to violate the statute. *Id.* The Seventh Circuit later relied on *Burge* in *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)—which did not even involve a prosecution under § 1503, let alone § 1512(c)(2).

40a

*Appendix B*

F.3d 964, 980 (McConnell, J., dissenting in part), *overruled by Begay*, 553 U.S at 148. And it is consistent with Justice Scalia's concurrence in *Begay*.

But this interpretation has other problems. If Congress intended for the common, linking element in both subsections to be the pendency of an "official proceeding," then the use of "otherwise" in § 1512(c)(2) would be superfluous. After all, both subsections include the term "official proceeding," suggesting that the common link should be something other than the pendency of an official proceeding; otherwise there would be no reason to repeat the term in both subsections.

Moreover, while this approach echoes Justice Scalia's concurrence in *Begay*, there are important differences between § 1512(c) and the ACCA. With respect to the ACCA, "burglary, arson, and extortion"—the specific crimes listed before the word "otherwise"—are paradigmatic examples of crimes that "involve[ ] conduct that presents a risk of physical injury to another." There is thus a relative parity between the two sides of "otherwise" in the ACCA that makes Justice Scalia's view potentially compelling. But not so with § 1512(c)(2). As the government argues, and other courts have recognized, *see, e.g., Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *10, "obstruct," "influence," and "impede," are quite broad terms. In contrast, "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" a record or document is a relatively narrow and discrete prohibition; that is, those are very limited ways in which to obstruct, influence or impede an official proceeding. Without some limitation,

41a

*Appendix B*

the text following "otherwise" is extraordinarily broad in relation to the text preceding it.

The structure of § 1512(c) cuts against this reading, as well. To say that the text of § 1512(c)(1) provides merely *examples* of crimes that fit within § 1512(c)(2)'s scope is to say that the principal (indeed, only) criminal offense in subsection (c) is listed in its second subsection. That turns expectation on its head and is, at the very least, not how a reasonable reader would expect a statute to be organized—a flaw when talking about any statute, but especially a criminal one. *Cf. Dimaya*, 138 S. Ct. at 1223-28 (Gorsuch, J., concurring in part and concurring in judgment).

*Subsection (c)(2) is a residual clause for subsection (c)(1).* A third interpretation of the statute—implied, at least, by Miller's arguments—is that subsection (c)(2) operates as a residual clause or catchall for the prohibition contained in subsection (c)(1). Under this reading, the word "otherwise" links the two subsections, but the link or commonality is found in the conduct prescribed by subsection (c)(1).

This interpretation is consistent with *Begay*. In particular, the *Begay* majority opinion rejected the government's argument "that the word 'otherwise' is *sufficient* to demonstrate that the examples [preceding 'otherwise'] do not limit the scope of the clause [following 'otherwise']." *Begay*, 553 U.S. at 144 (emphasis in original); *contra Montgomery* Br. at 8 ("Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)

42a

*Appendix B*

(1)—obstruction of an official proceeding—when the result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object."). To be sure, *Begay* acknowledged that "otherwise" could sometimes have that meaning, but it made clear that it did not *always* have such a limited role. As the Court put it, "the word 'otherwise' *can* (we do not say *must*, cf. *post*, at [150-51] (Scalia, J., concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Begay*, 553 U.S. at 144.

Moreover, the Court *held* that "the provision's listed examples"—that is, the text before "otherwise"—". . . indicate[ ] that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Id.* at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis in original). Justice Scalia himself understood that to be the holding, noting that the majority "read[s] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind,' despite the fact that 'otherwise' means that the *common* element of risk must be presented 'in a *different* way or manner.'" *Id.* at 151 (Scalia, J., concurring in judgment) (emphasis in original).[8]

---

8. Another court has concluded that "*Begay*'s discussion of the word 'otherwise' is remarkably agnostic," and that the Supreme Court "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591 at *11. The Court does not read the *Begay* decision as so limited. That particular sentence is a response to Justice Scalia's view (rejected by the majority) regarding the use of "otherwise." As noted above the line, Justice Scalia recognized that the majority had

43a

*Appendix B*

Under this interpretation, subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in subsection (c)(1)—"alter[ation], destr[uction], mutilat[ion], or conceal[ment]"—Congress was not underinclusive. Compare, for example, § 1519. That statute targets anyone who "alters, destroys, mutilates, conceals, *covers up, falsifies, or makes a false entry in* any record, document, or tangible object" for certain purposes in the context of department or agency investigations. 18 U.S.C. § 1519 (emphasis added). The highlighted acts are additional ways in which an individual can corruptly act on a "record, document, or tangible object" that are not covered by subsection (c)(1) but would be covered, on this reading, by subsection (c)(2).

To be sure, while the ACCA and § 1512(c)(2) both use the word "otherwise," there are key differences between those statutes. Perhaps most importantly, the ACCA has no line break or semicolon before its use of "otherwise." The government therefore argues that § 1512(c)(2) is more like the statute at issue in *Loughrin v. United States*, 573 U.S. 351, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014), in which the Supreme Court pointed to "two clauses hav[ing] separate numbers, line breaks before, between, and after them, and equivalent indentation" as "placing the clauses visually on an equal footing and indicating that they have separate meanings," *id.* at 359; *Montgomery* Br. at 36.

*Loughrin* dealt with a challenge to a conviction under

---

"read[] the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also 'in kind.'" *Begay*, 553 U.S. at 151 (Scalia, J., concurring in judgment).

44a

*Appendix B*

the federal bank-fraud statute, 18 U.S.C. § 1344, which
provides:

> Whoever knowingly executes, or attempts to
> execute, a scheme or artifice—
>
>> (1) to defraud a financial institution; or
>>
>> (2) to obtain any of the moneys,
>> funds, credits, assets, securities, or
>> other property owned by, or under
>> the custody or control of, a financial
>> institution, by means of false or
>> fraudulent pretenses, representations,
>> or promises;
>
> shall be fined not more than $1,000,000 or
> imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. A jury convicted Loughrin of violating
§ 1344(2) for cashing false checks at a Target, but it did
so without finding that he acted with "intent to defraud
a financial institution"—the language of § 1344(1). *See
Loughrin*, 573 U.S. at 354-55. The Court held that such
proof was not required for a conviction under § 1344(2).
*See id.* at 355-58.

The statute in *Loughrin* is different from § 1512(c)
in important ways. Most obviously, subsection (2) of
the bank-fraud statute does not include the adverb
"otherwise," and thus the Court did not even address
the primary interpretive question here. One might even

45a

*Appendix B*

conclude that the fact that Congress did *not* include the word "otherwise" in § 1344(2) suggests that it was aware of how to write broad prohibitions untethered to the text before it.

But the statutes are also similar. After all, both have separate numbering and line breaks, and as *Loughrin* makes clear, such choices matter. And when writing § 1512(c), Congress did opt for this drafting technique.

\* \* \*

In sum, looking just to the text of 18 U.S.C. § 1512(c), there are three possible, and two quite plausible, interpretations. It is possible that subsections (c)(1) and (c)(2) are not related at all (though this is not a very plausible interpretation). Subsection (c)(1) may contain just examples of the much broader prohibition contained in subsection (c)(2). Or subsection (c)(2) may be limited by subsection (c)(1). Based solely on the text of § 1512(c), the third option seems to present the fewest interpretive problems. But it is not abundantly clear that that interpretation is the correct one.

While the text is this Court's lodestar, however, it is not the only factor it must consider. "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993) (quoting *United States v. Heirs of Boisdore*, 49 U.S. 113, 8 How.

46a

*Appendix B*

113, 122, 12 L. Ed. 1009 (1850)). The Court thus turns next to structure.

### B.   The statutory context suggests that subsection (c)(2) has a narrow scope

The structure and scope of § 1512 also suggest that subsection (c)(2) has a narrow focus. In particular, the other subsections of the statute criminalize fairly discrete conduct in narrow contexts.[9] As examples, subsection (a) criminalizes, among other things, killing another person to prevent the attendance of a person at an official proceeding, 18 U.S.C. § 1512(a)(1)(A), or using physical force (or a threat of it) against a person with the intent to cause someone to withhold testimony from an official proceeding, *id.* § 1512(a)(2)(B)(i). Subsection (b), in turn, focuses on verbal conduct, such as knowingly using threats with intent to influence, delay, or prevent some testimony at an official proceeding. *Id.* § 1512(b)(1). And subsection (d) criminalizes the intentional harassment of a person and thereby hindering, delaying, preventing, or dissuading any person from attending or testifying in an official proceeding. *Id.* § 1512(d)(1).

Subsection (c)(1) continues the statute's focus on specific and particularized actions, albeit in a slightly different manner. Instead of making unlawful an individual's action with respect to *another* person to achieve some illicit end—as subsections (a), (b), and (d) do—subsection

---

9.   The title of the section is "Tampering with a witness, victim, or an informant." And while that might not describe subsection (c), it also captures the narrow, evidentiary focus of the rest of the statute.

47a

*Appendix B*

(c)(1) prohibits an individual from taking certain actions *directly*. It prohibits "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with intent to impair the object's integrity or availability for use in an official proceeding." *Id.* § 1512(c)(1). Unlike the other subsections of § 1512, it does not require action directed at another person. But like the other subsections of § 1512, it homes in on a narrow, focused range of conduct.

If, however, the scope of subsection (c)(2) is not limited by subsection (c)(1)—if "otherwise" either signals a clean break or means subsection (c)(1) is only an example fitting within (c)(2)'s scope—it would introduce something of an internal inconsistency: subsection 1512(c)(2) would be the only provision in § 1512 not to have a narrow focus. Indeed, the government has relied on the breadth of (c)(2)'s terms to form the basis of its argument. And this inconsistency would come in the oddest of places: in a subsection of a subsection nestled in the middle of the statute. At a minimum, a reader would not expect to find in a statute that is otherwise narrowly (and consistently) tailored a criminal prohibition of exceptionally broad scope, especially in that location. Congress does not hide elephants in mouseholes, *see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001), but this seems precisely that.

A different reading would also create substantial superfluity problems. After all, if subsection (c)(2) is not limited by subsection (c)(1), then the majority of § 1512 would be unnecessary. At a minimum, conduct made unlawful by at least eleven subsections—§§ 1512(a)(1)(A),

48a

*Appendix B*

1512(a)(1)(B), 1512(a)(2)(A), 1512(a)(2)(B)(i), 1512(a)(2)(B)(iii), 1512(a)(2)(B)(iv), 1512(b)(1), 1512(b)(2)(A), 1512(b)(2)(C), 1512(b)(2)(D), and 1512(d)(1)— would also run afoul of § 1512(c)(2). To be sure, superfluity is not typically, by itself, sufficient to require a particular statutory interpretation. *See Hubbard v. United States*, 514 U.S. 695, 714 n.14, 115 S. Ct. 1754, 131 L. Ed. 2d 779 (1995). But here, such substantial overlap within the same section suggests that Congress did not mean § 1512(c)(2) to have so broad a scope.

Another court has sought to allay this overlap concern by pointing to the language Congress could have used:

> [I]t would have been easy for Congress to craft language to achieve the goal that Defendants now hypothesize. Congress, for example, could have substituted Section 1512(c)(2) with the following: "engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding." The fact that Congress, instead, enacted language that more generally—and without the limitations that Defendants now ask the Court to adopt—criminalized efforts corruptly to obstruct official proceedings speaks volume.

*Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *12. That is certainly true, and in fact is why the Court does not believe that there is a single obvious interpretation of the statute. But it is also the case that reading § 1512(c)(1) as limiting the scope of § 1512(c)(2) avoids many of these structural or contextual issues

49a

*Appendix B*

altogether. Under such a reading, § 1512(c)(2) operates as a catchall to the narrow prohibition Congress created in § 1512(c)(1)—not as a duplicate to nearly all of § 1512.[10]

### C. The historical development of § 1512 suggests that § 1512(c)(2) operates as a catchall to § 1512(c)(1)

Prior to the enactment of subsection 1512(c) in 2002, § 1512 made criminal only actions directed at other persons. For example, at that time subsection (b)(2) provided:

> **(b)** Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades *another person*, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

>> **(2)** cause or induce any person to—

>>> **(A)** withhold testimony, or withhold a record, document, or other object, from an official

---

10. Perhaps another way of reading § 1512(c)(2) without creating substantial superfluity problems would be as creating "direct" liability for the other types of conduct covered by § 1512—that is, that it makes criminal an individual doing directly those things for which the rest of § 1512 requires action directed at another person. Neither party presses this argument (or anything like it), so the Court does not address it further. But the Court does note that, while this reading might eliminate some superfluity, placing this kind of catchall in a subsection of a subsection in the middle-back of § 1512 is still unintuitive.

50a

*Appendix B*

proceeding;

(**B**) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(**C**) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(**D**) be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) (1996). Other subsections similarly prohibited conduct directed at causing or influencing "another person" to take improper action. *Id.* §§ 1512(a)(1) (A)-(C), 1512(c)(1)-(4). This created a gap in the statutory scheme: § 1512 made it unlawful to cause "another person" to take certain steps—such as to "alter, destroy, mutilate, or conceal an object"—but did not make it unlawful for a person to take such action directly.

51a

*Appendix B*

Section 1512(c) filled that gap, and took much of its language from § 1512(b). Compare the two provisions:

**(b)** Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

    **(2)** cause of induce any person to—

        **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

        **(B)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;*

        **(C)** evade legal process summoning that person to appear as a

**(c)** Whoever corruptly—

    **(1)** *alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding*; or

    **(2)** otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

52a

*Appendix B*

witness, or to produce
a record, document,
or other object, in an
official proceeding; or

**(D)** be absent from an
official proceeding to
which such person has
been summoned by
legal process; . . .

shall be fined under this
title or imprisoned not more
than ten years, or both.

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18
U.S.C. § 1512(c) (2002) (right) (emphasis added). Just three
months later, the same Congress added § 1512(a)(2)(B),
which again drew on § 1512(b):

**(b)** Whoever knowingly
uses intimidation or
physical force, threatens,
or corruptly persuades
another person, or attempts
to do so, or engages in
misleading conduct toward
another person, with intent
to—

**(a)**

...

**(2)** Whoever uses
physical force or the
threat of physical force
against any person, or
attempts to do so, with
intent to—

53a

*Appendix B*

**(2)** cause or induce any person to—

    **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    **(B)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

    **(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    **(D)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

**(B)** cause or induce any person to—

    **(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    **(ii)** *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;

    **(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

54a

*Appendix B*

shall be fined under this title or imprisoned not more than ten years, or both.

**(iv)** be absent from an official proceeding to which such person has been summoned by legal process; . . .

shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(b)(2) (1996) (left) (emphasis added); 18 U.S.C. § 1512(a)(2)(B) (2002) (right) (emphasis added).

A fair inference is that, by adding subsection (c) to fill the gap in § 1512, and by drawing heavily from a single provision out of four already included in subsection (b), Congress intended subsection (c) to have a narrow, limited focus—just like subsection (b)(2)(B). The only difference is that subsection (c) does not include the requirement of acting through another person. That the same Congress further adopted *all* of § 1512(b)(2) in § 1512(a)(2)(B)—rather than just one sub-subsection of § 1512(b)(2)—further suggests that its enactment of §1512(c)(1) was intended to be narrow. Perhaps just as important, if subsection 1512(c)(2) is as broad as the government contends here, there would have been no need for the very same Congress to add § 1512(a)(2)(B) just three months later.

55a

*Appendix B*

**D.   If anything, the legislative history supports a
narrow reading of subsection (c)(2)**

"Legislative history, for those who take it into account,
is meant to clear up ambiguity, not create it." *Milner v.
Dep't of Navy*, 562 U.S. 562, 574, 131 S. Ct. 1259, 179 L.
Ed. 2d 268 (2011). The government relies on legislative
history, but it does not support the government's position.

Section 1512(c) was enacted as part of the Sarbanes-
Oxley Act of 2002, 116 Stat. 745. "The Sarbanes-Oxley
Act, all agree, was prompted by the exposure of
Enron's massive accounting fraud and revelation that
the company's outside auditor, Arthur Andersen LLP,
had systematically destroyed potentially incriminating
documents." *Yates v. United States*, 574 U.S. 528, 535-36,
135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (plurality opinion).
As discussed above, while § 1512(b) "made it an offense to
'intimidat[e], threate[n], or corruptly presuad[e] *another
person*' to shred documents," the statute did not prohibit
individuals from shredding documents themselves. *Id.*
at 536 (emphasis added). The Senate Report for the Act
identified this statutory loophole:

> Indeed, even in the current Andersen case,
> prosecutors have been forced to use the
> "witness tampering" statute, 18 U.S.C. § 1512,
> and to proceed under the legal fiction that the
> defendants are being prosecuted for telling
> other people to shred documents, not simply
> for destroying evidence themselves. Although
> prosecutors have been able to bring charges

56a

*Appendix B*

thus far in the case, in a case with a single person doing the shredding, this legal hurdle might present an insurmountable bar to a successful prosecution.

S. Rep. No. 107-146, p. 7 (2002).

As the plurality opinion in *Yates* explains, 18 U.S.C. § 1519 was originally introduced to plug this gap, *Yates*, 574 U.S. at 535-36, and § 1512(c) was added later, *id.* at 542. In particular, Senator Lott introduced § 1512(c) on July 10, 2002. *See Montgomery*, 2021 U.S. Dist. LEXIS 246750, 2021 WL 6134591, at *15. He stated that the amendment's "purpose" was "[t]o deter fraud and abuse by corporate executives"—in line with the Enron concern. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). He later stated that the new subsection "*would enact stronger laws against document shredding.* Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered. Timing is very important." *Id.* at S6545 (emphasis added). In Senator Lott's view, his amendment would fill this gap: "So this section would allow the Government to charge obstruction *against individuals who acted alone*, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year." *Id.* (emphasis added) Then-Senator Joseph Biden referred to new subsection (c) as "making it a crime for document shredding," something he thought the pending bill already did. *Id.* at S6546.

57a

*Appendix B*

Senator Hatch made similar statements regarding the focus of the proposed new subsection on documents and document-shredding, as well as its ties to the then-recent Enron scandal. Senator Hatch explained that "the amendment strengthens an existing federal offense that is often used to prosecute document shredding and other forms of obstruction of justice," noting that current law "does not prohibit an act of destruction committed by a defendant acting alone. While other existing obstruction of justice statutes cover acts of destruction that are committed by an[] individual acting alone, such statutes have been interpreted as applying only where a proceeding is pending, and a subpoena has been issued for the evidence destroyed." *Id.* at S6550. To Senator Hatch, the addition of § 1512(c) "closes this loophole by broadening the scope of Section 1512." *Id.* It "*would permit the government to prosecute an individual who acts alone in destroying evidence, even where the evidence is destroyed prior to the issuance of a grand jury subpoena.*" *Id.* (emphasis added). He concluded by noting that the Arthur Andersen prosecutors "had to prove that a person in the corporation corruptly persuaded *another* to destroy or alter documents, and acted with the intent to obstruct an investigation." *Id.* (emphasis added). The new § 1512(c) would ensure "that individuals acting alone would be liable for such criminal acts." *Id.*

To the extent it is relevant at all, the weight of this legislative history is inconsistent with the government's position here. It suggests that, in the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to

58a

*Appendix B*

cause or induce *another* person to destroy documents, but did not make it illegal to do so by oneself. Congress closed that loop by passing subsection (c), and nothing in the legislative history suggests a broader purpose than that.

### E.   Miller's alleged conduct falls outside of § 1512(c)(2)

For all the foregoing reasons, the Court believes there are two plausible interpretations of the statute: either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2). The text, structure, and development of the statute over time suggest that the second reading is the better one. But the first is, at a minimum, plausible.

At the very least, the Court is left with a serious ambiguity in a criminal statute. As noted above, courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute," *Aguilar*, 515 U.S. at 600, and have "construe[d] penal laws strictly and resolve[d] ambiguities in favor of the defendant," *Nasir*, 17 F.4th at 473 (Bibas, J., concurring) (citing *Liparota*, 471 U.S. at 427). Applying these principles here "gives citizens fair warning of what conduct is illegal, ensuring that [an] ambiguous statute[ ] do[es] not reach beyond [its] clear scope." *Nasir*, 17 F.4th at 473 (Bibas, J., concurring). And it makes sure that " the power of punishment is vested in the legislative, not the judicial department." *Id.* (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37 (1820) (Marshall, C.J.)). The Court therefore concludes that § 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant

59a

*Appendix B*

have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding.

Miller, however, is not alleged to have taken such action. Instead, Count Three of the Second Superseding Indictment alleges only that he "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." Indictment at 2-3. Nothing in Count Three (or the Indictment more generally) alleges, let alone implies, that Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote.

The government nevertheless argues that Miller's conduct "'otherwise obstruct[ed], influence[d], or impede[d]' Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote." *Montgomery* Br. at 40-41 (modifications in original). But none of those facts are set forth in the indictment, and the Court cannot consider them on this Motion to Dismiss. *Akinyoyenu*, 199 F. Supp. 3d at 109-10 . And in any event, the government does not argue that Miller *himself* took or attempted to take any action with respect to those records or documents. Absent such an allegation, the Indictment fails to allege a violation of 18 § U.S.C. 1512(c)(2).

60a

*Appendix B*

\* \* \*

For the foregoing reasons, the Court will grant Miller's Motion to Dismiss Count Three of the Superseding Indictment, ECF No. 34. An appropriate order will follow.

DATE: March 7, 2022

/s/ Carl J. Nichols
CARL J. NICHOLS
United States District Judge